THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* DOMENICO FIORENTINO, Appellant.

(Argued December 13, 1909; decided January 18, 1910.)

APPEAL from a judgment of the Supreme Court rendered January 5, 1909, at a Trial Term for the county of New York, upon a verdict convicting the defendant of the crime of murder in the first degree.

*John Palmieri* for appellant.

*William Travers Jerome, District Attorney (Robert C. Taylor* of counsel), for respondent.

VANN, J. The parties to the homicide which is the subject of this review were two Italians, Natali Mauro, the deceased, a large, powerful, well-built man, and Domenico Fiorentino, the defendant, whose size or strength does not appear. The place was the street in front of a saloon kept by one Michael Pelotti on the northeast corner of Two Hundred and Fourteenth street and the White Plains road, in the borough of The Bronx, and the time was the 16th of October, 1908, at about 7:30 in the evening.

The defendant is a laborer, thirty-two years of age, who, three months before the homicide while boarding with the deceased, had been accused by him of improper relations with his wife, which he denied and so far as appears the charge was wholly without foundation. Mauro told the defendant to leave his 'house, saying, "You want to leave now, but some day we will meet again. In my house I would not do anything to you, because I don't like to disturb my own' house; the first time I will meet you I will cut you in pieces, the smallest piece of your body will be the size of your ear." The defendant left, after paying Mauro what he owed him, in order, as he testified, not "to have any trouble with that man." Before this Mauro had recently whipped one of his boarders, and on the same day that he told the defendant to leave he turned another boarder out of doors, saying that if he remained any longer, "I will do to you the same thing I am going to do to the other."

Three weeks before the tragedy one Michel told the defendant that Mauro had said to him, and such was shown to be the fact, that he would kill the defendant on sight. Up to this time, as the defendant swore, he had never carried a revolver, although he had one that a friend had given him about a year before. When he heard of the last threat to take his life made by Mauro, he took the revolver from the valise where he kept it, loaded as it was when presented to him, and thereafter carried it to defend himself.

The parties met for the first time after the last threat on the evening of October 16th at Pelotti's saloon, where the defendant was in the habit of going to see a free show, while Mauro had never been there before. Why he came on this

occasion, or whether he knew it was a place frequented by the defendant, does not appear. The defendant was seated at a table drinking and chatting with several friends, when Mauro entered and either bought a drink for himself, as some of the witnesses say, or drank with the defendant upon his invitation to all present, as others said. The defendant and one of the witnesses for the People testified that Mauro sat at the table and drank with him, while two observers denied it. At all events, after the drink Mauro, without any provocation from the defendant, approached him from behind and said, "You are the fellow I am looking for," and at once assaulted him in the back and struck him three or four times with his fist, as most of the witnesses thought, for they saw no weapon, but with some sharp instrument in his hand, as the defendant insisted, stating that he saw it as he turned around. The counsel for the People, with his usual fairness, says in his brief: "There is no doubt that the deceased was the aggressor, and so far as appears the defendant did nothing to provoke him." There is no evidence that prior to the assault upon him, the defendant had ever thought of injuring Mauro.

According to the version of most of the witnesses the defendant, as he was assaulted, turned around, backed off, drew a revolver and snapped it three times, but it did not go off and it did not appear to have been pointed at any one. Probably the cartridges were stale as the piece had been loaded so long. The defendant swore that Mauro chased him out of the saloon, but this version did not have the support of any other witness. According to the weight of evidence, Mauro went out first and the defendant, in quick pursuit, while Mauro was still running away, fired at him once and missed and then fired a second time, when Mauro, hit in the back of the neck, fell in his tracks and died in a short time. The claim of self-defense, upon which the counsel for the defendant spent much time during the trial, had little support aside from the testimony of the defendant himself. The weight of evidence was against it, for it tended to show that Mauro was running away and that the defendant was running after him when he fired the fatal shot.

The defendant did not approach the fallen man, but threw

away his revolver and fled, and when arrested soon after, he said: "Me no afraid electric chair." The revolver was promptly found with two empty cartridges and three loaded shells in the chambers. Not at once, but in a short time, and in answer to questions from the arresting officer, the defendant said his coat was cut by a knife or razor that he saw in the hands of Mauro when he made the assault upon him. There is no doubt that the coat looks as if it had been cut, three times in the back and twice on the left sleeve. It was produced before us and we saw it. The counsel for the People admits in his brief that it may have been cut, but he insists that it might have been cut before the meeting in the saloon, or even after the arrest. He founds this statement on the evidence of the officer who "prepared the case," as he had "prepared a good many homicide cases" before, that the body of the defendant was not cut, which seems to be admitted, and that the lining of the coat was not cut, which does not appear to be admitted, as to at least two of the cuts.

From the beginning to the end, the affair took but one or two minutes. While there was time for that deliberation and premeditation which stamp homicide as murder in the first degree, it by no means follows that the defendant, with the hot blood of Southern Europe coursing through his veins, under the heat of an unprovoked assault and the terror of recent threats by the deceased to take his life, did in fact act with deliberation and premeditation. He had time to cool off, but did he cool off, meditate and deliberate? Was his mind in such a condition that he could deliberate within the meaning of the statute? The careful consideration of this question, apparently, was all that stood between him and death. He may have committed a serious crime, but whether he committed the most serious crime known to the law, depended not simply on his time to deliberate, but also on the controlling fact whether, with his mind inflamed by aggravating circumstances for which he was not responsible, he did deliberate and with coolness and premeditation shoot the deceased. It may well be that his mental condition did not permit deliberate action, which requires reflection and a decision to act, before action is taken.

The charge of the trial justice did not present this question with the clearness which its importance demanded. While within the law, it was suggestive and edgewise toward the defendant throughout. Telling questions, each pregnant with plausible argument against the defendant, were asked in the interest of the people. Thus the trial justice, after reciting some of the evidence given by the witnesses for the prosecution, asked the jury: "Do you observe any where in the testimony any reason why any one of these witnesses should come here and commit willful perjury in a case of this kind? You heard them examined and cross-examined. Has anything transpired in the case which would justify you in saying that any one of these witnesses is wilfully telling a falsehood about what took place? This is solely for you to determine. * * * Now what did happen? Was there a quarrel in the saloon? Did the deceased attack the defendant? And then when the defendant drew his revolver did the deceased run away, withdraw from the quarrel and try to escape, and did the defendant then follow him and shoot him and kill him?"

While the court dwelt with emphasis on the fact that the defendant had time to deliberate, he did not with equal emphasis ask the jury to find whether he actually did deliberate, although the recent assault by the deceased, as the unprovoked aggressor, with the few seconds intervening between the assault and the fatal shot, made this the important question in the case. In view of the weight of evidence, the sole question of substance was not whether the defendant was guilty, but of what he was guilty, whether of murder in one of its degrees or of manslaughter in the first degree. In the excitement of the attack upon him and the previous threats to kill him, did he act with that deliberation and premeditation essential to the highest crime, or did he, blind with rage and fear, act upon sudden impulse, without reflection or even without intent to kill, in the heat of passion, with a dangerous weapon? Assuming that he went too far, did he start in fear and go on quickly and blindly under a passionate impulse? Was he in a mental condition to deliberate? These questions should have been presented to the jury fully and fairly, for the life of a human being depended upon them. They

were not thus presented. The bulk of the charge and all its emphasis was laid upon murder in the first degree. Nearly eighteen pages are devoted to that subject, including the law of self-defense, and but three folios to the second degree and manslaughter. Murder in the second degree, so strongly suggested by the evidence, was dismissed with three sentences of explanation after the statute was read, while manslaughter in the first degree was confined to the statutory definition, without a word of explanation or exposition in the body of the charge. Moreover, the judge did not tell the jury that if they found that the defendant had committed a crime, but there was a reasonable doubt as to which of two or more degrees he was guilty, he could be convicted of the lowest of these degrees only, and he was not asked to so charge. (Code Crim. Pro. § 390.)

The jury retired, but soon returned in doubt and asked for further instructions upon the subject of manslaughter in the first degree. The court again read the statutory definition and added: "In manslaughter in the first degree there is no design to effect death, but the death is accomplished in the heat of passion, in a cruel and unusual manner or by means of a dangerous weapon." Still one of the jurors was not satisfied and asked the court to explain "in a little more detail." The court then said: "If the defendant were not justified, as he claims, in killing, and you are satisfied beyond a reasonable doubt that he killed the deceased in the heat of passion by means of a dangerous weapon, then he is guilty of manslaughter in the first degree, provided he had no design to kill. In manslaughter in the first degree there is an absence of design to kill. In a murder there must be a design to kill — both in murder in the first degree and in murder in the second degree. In manslaughter there need not be a design to kill. If you are satisfied that there was no design to kill, that the killing was done in the heat of passion by means of a dangerous weapon and there was no justification of it, then he is guilty of manslaughter in the first degree."

The counsel for the People thereupon asked the court to instruct the jury "that if they are satisfied that the defendant, when he shot, intended to inflict death, intended to kill, and

there was no justification, then it was either a case of murder in the first degree or murder in the second degree." The court remarked, "Further than I have charged on that I will not charge. I think I have charged the jury very fully on that. Is there anything further?" By defendant's counsel: "May I say a word on the question of design?" The court: "No argument. Have you any requests to make?" By defendant's counsel: "Yes, your Honor." The court: "Proceed." By defendant's counsel: "In determining whether the defendant committed this assault in the heat of passion, if the jury find that it was not done with premeditation and deliberation, I will ask your honor to charge the jury that they may take into consideration the fact that he was not the aggressor; that he had been himself assaulted; that he drew the weapon after he was assaulted." The court: "Further than I have charged on that subject I decline to charge further." The facts recited in the request that the defendant was not the aggressor, that he himself had been assaulted and that he drew the weapon after he was assaulted were not disputed.

When a jury has once withdrawn to deliberate on their verdict and then returns for further instructions counsel cannot, as a matter of right, present a request to charge, but the court may allow it as a matter of discretion. In this case the court did allow it by telling the counsel to proceed after he had asked permission to present a request. The request, therefore, was as regular as if had been presented in due time. No exception, however, was taken to the ruling, and hence the defendant cannot rely upon it as reversible error, although under the statute in our sound discretion we may rely upon it by reversing the judgment of conviction in the interest of justice. (Code Crim. Pro. § 528.)

I am, personally, of the opinion that the request was proper and that it should have been charged, because the instructions were inadequate on the subject of manslaughter in the first degree. They did not apply the definition to the facts of the particular case before the court. The request tended to bring before the minds of the jury the peculiar, important and conceded facts applicable to the situation and which nowhere in the body of the charge had been presented

in the proper connection. The fact that the deceased was the aggressor always has had and always ought to have a material bearing on the degree of guilt. "Who began the fight" is a question of instinct on hearing of an affray. A majority of the court, however, think the judgment should not be reversed on this ground, so without further discussion of the subject I will proceed to examine certain rulings that were excepted to.

At the request of the counsel for the People the court charged " that flight may be considered by the jury as evidence of guilt." The court added, " There is testimony in this case that the defendant, after the shooting, fled and was pursued by an officer and threw the revolver away. You may consider those circumstances on the question of guilt." The defendant's counsel excepted, and asked the court to charge that " Flight of itself is no evidence of guilt." The court declined to charge further upon the subject, but added, " They may consider that on the question of the defendant's guilt." An exception was duly taken. The court did not charge and was not asked to charge, that in connection with the subject of flight the jury should consider the explanation given by the defendant that he fled because he was afraid of violence from the friends of the deceased. The explanation was not unreasonable.

Evidence of flight is competent because, when unexplained, it tends to show consciousness of guilt, although standing alone it raises no legal presumption thereof. When the crime is proved, but the identity of the criminal is in doubt, it bears somewhat on the question of identity. Ordinarily it is of slight value, and of none whatever unless there are facts pointing to the motive which prompted it and, hence, any explanation of the accused should always be considered in connection therewith. While all acts of concealment are competent, as was recently said by the Supreme Court of the United States: " They are mere circumstances to be considered and weighed in connection with other proof with that caution and circumspection which their inconclusiveness when standing alone require." (*Hickory* v. *United States*, 160 U. S. 408, 417.) The observations of Mr. Justice WHITE in the case cited leave little to be said upon the subject, but the

following authorities, in addition to those cited by him, are referred to: *People* v. *Ogle* (104 N. Y. 511); *People* v. *Hughson* (154 N. Y. 153, 156); *People* v. *Place* (157 N. Y. 584, 598); *Alberty* v. *United States* (162 U. S. 499, 508).

The request to charge that "flight of itself is no evidence of guilt" was sound as an abstract proposition of law, but academic as applied to this case, for there were conceded facts tending to show a guilty as well as an innocent motive for the flight. While the exception to the ruling, when all that the court said upon the subject is considered together, did not raise reversible error, it raises regret that the court did not call attention and was not requested to call attention, to the explanation of the defendant.

The defendant when on the stand as a witness in his own behalf, testified that Mauro "drank half a glass, and then left the bar and came across to where I was and commenced to glance and look at me, straight in my face, as I am doing now (indicating). I was sitting down. This is the way he was motioning (indicating that the deceased was shaking his hand and looking straight at this defendant who was sitting down at a table). When I saw the bad way he was looking at me and knowing that he had come there to make trouble, I took a dollar out of my pocket and spoke to the bartender and said, "Give a drink to every one here in this place;" that included the deceased. "The drinks were served. I observed the deceased take my drink. After I paid for the beer I stood up because I want to go away." Question by defendant's counsel on the direct examination: "Now tell the jury the reason, if you know, after ordering the drinks for everybody there, including the deceased, you wanted to go away." This was objected to, no ground being stated, and the objection was sustained. The defendant's counsel then remarked, "I want to show the operation of his mind at the time, his peaceful attitude towards the deceased." The court said: "I sustain the objection. He may tell what he did." An exception was duly taken. The question did not call for what he did, but for his reason for what he did.

This ruling was wrong, because the question bore directly on the motive of the defendant and upon the vital question

whether he acted with a deliberate and premeditated design to effect the death of Mauro. If, as is probable, he had answered that he wanted to go away, because, in view of Mauro's previous threats and his then threatening attitude, he was afraid of him and wanted to get away from him, it would have tended to reduce the grade of the crime, which followed almost immediately. The motive for an act done by a person charged with crime may always be shown by his own evidence, even if it involves a mental operation. If the defendant during one minute tried to get away from Mauro because he was afraid of him, is it probable that during the next minute he deliberately and unjustifiably took his life? Did his mind leap from a peaceful to a murderous attitude in barely an instant of time? Assuming that it might, is it probable that it did, under the circumstances surrounding him? The question excluded bore directly on that probability. It was not answered before it was asked, for while the defendant swore that he wanted to get away, he was not permitted to state why he wanted to get away. The jury might have inferred why, but the defendant had the right to prove why, for they might not have drawn the right inference. The counsel for the People, upon the argument before us, expressed regret that the ruling was made, but he insisted that it could have done no harm. We will discuss that feature later on.

The arresting officer testified that there was "no scratch or cut on his (defendant's) body of any kind." Later the defendant was asked on his direct examination : "Can you tell the jury any reason, if you know, why the deceased did not succeed in cutting you?" This was excluded as calling for a conclusion, and the defendant excepted. Upon the same ground and subject to exception the following question was next asked and also excluded : "Can you tell the jury any reason why your coat is cut and there are no cuts on your body?"

Notwithstanding the form of these questions, they called for a fact and could have been logically answered only by stating a fact. They did not call for a mere theory, but for an explanation of a conceded fact, which required the statement of another fact. *Non constat* the defendant might

570 MEMORANDA. [Vol. 197.

have answered, had he been permitted, that the lining was made of thick and tough material that the knife did not penetrate, or that there was a double lining, one being of leather placed between as a protection against Mauro's threats, or that he wore an unusually thick woolen shirt, or that the knife struck a button, or have given some other fact to account for the condition stated. He might have said that the knife glanced, because he was in such rapid motion trying to dodge and get away. He had a right to give even a poor explanation. We have no right to assume that he would not have so answered the question as to satisfy the jury that Mauro used a knife on him, even if it did not touch his person. If the deceased was trying to cut the defendant, the danger, the fear and the provocation were greater than if he simply struck him with his fist. The cuts on the coat tended to support the theory that he was attacked with a knife. That theory was weakened by the evidence of the officer who made the arrest, that his body was not cut, and he had a right to explain why it was not cut. He had a strict legal right to give any explanation that he could. We are surprised that the questions were objected to. The danger of excluding competent evidence is greater than the danger of receiving incompetent evidence, and we have before admonished counsel upon the folly of running unreasonable risks by making objections which invite doubtful rulings. (*People* v. *Cascone*, 185 N. Y. 317, 334.) We repeat the admonition in this case. The defendant should have been allowed reasonable latitude in telling his own story and any doubt as to admissibility should have been resolved in his favor. The rulings were erroneous.

Should we order a new trial for these errors, which, as it must be conceded, are slight? In view of the fundamental fact that Mauro was the aggressor and that the defendant acted under the strain of strong and recent provocation, and of the evidence given by a former employer that he had a good reputation for peace and quietness, we cannot say that the erroneous rulings did not change the result. We do not know what the evidence would have been if the questions had been answered. It is true that in many cases where we have had no doubt that the conviction was just, we have overlooked

errors even more serious than these, because the statute permits it under such circumstances, and, doubtless, under such circumstances, we shall do so again. (Code Crim. Pro. § 543.) But in this case, while we all think that the evidence permitted a verdict of murder in the first degree, the most of us think that in view of the peculiar facts of the case, as it now appears, a verdict of a somewhat lower grade would have been safer and more satisfactory. Hence, I think that the errors, though slight, call for a new trial. A man condemned to die, as he is marched to the place of execution, should not be able to say : " If my judges had heard my whole story I might not be here."

I vote for a reversal and a new trial.

CHASE, J. (dissenting). I think the judgment of conviction should be affirmed. Assuming that up to the time when Mauro started to leave the saloon he had been the aggressor, and that the defendant had up to that time simply defended himself from attack, there was after the defendant first drew his pistol ample opportunity for him to have avoided further encounter or association with Mauro and there was also an abundance of time after he commenced to run after Mauro, and before the fatal shot was fired, for him to have deliberated and determined whether he would shoot and kill him. The evidence is overwhelming that when the defendant drew his pistol not only did the other persons present in the saloon run therefrom but that Mauro ran from the saloon and was then followed by the defendant. Mauro ran diagonally across the street and the defendant shot at him as he ran, and a few seconds after the first shot was fired and when Mauro was about one hundred feet from the door of the saloon running from the defendant on the opposite side of the street therefrom, the defendant, who was then in the street from ten to fifty feet behind Mauro, stopped and deliberately took aim at him and fired the fatal shot.

If the defendant had killed Mauro at the time when he backed away from him and ineffectually snapped his pistol three times while they were in the saloon together, his claim that he was acting in self-defense or in the heat of passion

might have been accepted by the jury. And if the jury had, under such circumstances, found the defendant guilty of murder in the first degree much that is said by the majority of the court in the opinion about to be handed down would apply to the facts as they would then have been presented. The defendant's claim that he committed the homicide in self-defense, however, is without merit. It rests solely upon his own testimony, and it is clearly opposed to the testimony of all the other witnesses, and to the admitted facts and circumstances, particularly those relating to the place where Mauro was when he was killed.

The members of this court are unanimous in the opinion that the evidence is sufficient to sustain the verdict of murder in the first degree, although some of the members of the court would not, as jurymen, have voted for such a verdict, but would have found a verdict of murder in the second degree, or of manslaughter in the first degree. Perhaps a verdict for a lesser degree of crime would have been more satisfactory to all of us. Many questions are suggested in the majority opinion. Every question so suggested has been answered by the jury against the defendant, and there is evidence to sustain the answers so given to each of such questions. The responsibility in deciding upon the evidence and for the verdict rests upon the jurymen. A majority of the members of the court, as I understand from the opinion about to be handed down, concede that the errors committed by the trial court, if any, are slight, but they are of the opinion that the trial judge in his charge dwelt with emphasis on the fact that the defendant had time to deliberate, but did not with equal emphasis ask the jury to find whether he actually did deliberate before firing the fatal shot. Much is said about Mauro being the aggressor in the first instance, and that some of the evidence could be so construed as to permit of a verdict of manslaughter in the first degree. An examination of the evidence leads me to the conclusion that the defendant intended to kill Mauro, and that a verdict either of murder in the first degree based upon deliberation and premeditation, or of murder in the second degree based upon a design to effect the death of Mauro, although without deliberation and premeditation,

was to have been expected. The defendant's experienced counsel doubtless appreciated the effect of the testimony that would be produced and the defendant's danger of being found guilty of murder in the first degree. On the trial, as we have seen, he devoted substantially all his efforts to show the court and jury that the shooting by the defendant was done in self-defense. The entire record shows that that effort was continued until the final disposition of the case. The trial judge devoted the greater part of his charge to that subject. It was most natural for him to devote his charge principally to the questions that had been made prominent in the course of the trial.

I do not find in the charge of the trial judge anything unfair to the defendant. In the prevailing opinion is a quotation from the charge in proof and confirmation of the statement that it is suggestive and edgewise toward the defendant. There is omitted from the quotation after the words "This is solely for you to determine," the following words of the trial judge, viz. : "Of course, unless you have some reason for it, it would not be proper for you to arbitrarily state that this or that witness is perjuring himself. You should have some basis for a finding of that kind. And what I say with regard to the People's witnesses I will now repeat with regard to witnesses for the defense — that you should not arbitrarily state that any witness for the defense, including the defendant, has committed perjury. You should have some basis for it — some basis such as interest in the case or some other motive." So, in every instance, the jury were correctly charged as to their duty in weighing testimony.

The court narrated to the jury the substance of the testimony given by the defendant personally and by his witnesses, and said, "The People are bound to satisfy you beyond a reasonable doubt that the defendant is guilty of a deliberate and premeditated murder. It is not for the defendant to prove his innocence, it is for the People to prove his guilt beyond a reasonable doubt." The court further said, "If you find that he is not guilty of murder in the first degree or if you have any reasonable doubt that he is guilty of that grade of homicide then it would be your duty to consider whether or not he is guilty of murder in the second degree."

" Murder in the second degree is defined by statute to be as follows : Such killing of a human being is murder in the second degree when committed with the design to effect the death of the person killed, or of another, but without premeditation or deliberation. You see it differs from murder in the first degree in that murder in the first degree the design to kill must be preceded by some amount of deliberation and premeditation. In murder in the second degree there need not be that premeditation and deliberation but only a design to kill. And if you are satisfied upon this evidence that the defendant was guilty of murder in the second degree — that is a killing without deliberation or premeditation — but with a design to kill, then you should find him guilty of murder in the second degree."

" Of course if he acted in self-defense why he is not guilty of any grade of crime. If you find that he is not guilty of murder in the first degree, and not guilty of murder in the second degree, or have a reasonable doubt on that subject, then you consider whether he is guilty of manslaughter in the first degree. And that is a crime that is defined as follows, ' Such crime is manslaughter in the first degree when committed without a design to effect death in the heat of passion but in a cruel and unusual manner, or by means of a dangerous weapon.' So your verdict in this case may be either guilty of murder in the first degree. Guilty of murder in the second degree. Guilty of manslaughter in the first degree. Or, not guilty."

I do not see how the jury could have misunderstood such a plain and accurate statement of the law applicable to the evidence before the jury. At the close of the main charge counsel for the defendant made two unimportant requests to further charge the jury, both of which requests were substantially granted and the charge was then satisfactory to the defendant. The only other request by the counsel for the defendant is the one in regard to the defendant's flight which has been referred to in the prevailing opinion.

The statements made by the court to the jury when they returned for further instructions were clear, full and accurate and the jury could not have then misunderstood the court.

No objection or exception was taken by either party. After a court has charged a jury at length and has passed upon all requests to charge made by counsel for the parties, it rests in a reasonable discretion whether further requests to charge will be made. This is particularly so when the remarks made by the court to the jury on their return into court are clear and accurate and the requests for further charges relate to matters not directly within the questions suggested by members of the jury, but are merely incidental thereto. If the request to further charge the jury which was made by the district attorney had been so made by him at the end of the main charge, it should have been granted and I will assume that it is also true of the request made by the defendant's counsel. The court treated both sides alike and refused to further charge the jury and in my opinion it was not error for him so to decide. No exception was taken and the determination by the court not to further charge was substantially assented to by both counsel. In any event the fact that the defendant was not in the first instance the aggressor was not at any time seriously disputed.

The defendant's testimony fully discloses that he claimed that after he gave a drink to every one in the saloon, and saw " the bad way he (Manro) was looking at me (defendant) " that he stood up " because I (he) wanted to go away," and that he further claimed that he desired to escape from Mauro. The refusal to allow the defendant to answer the question, " Now tell the jury the reason, if you know, after ordering the drinks for everybody there including the deceased, you wanted to go away," could not have prejudiced the defendant. It was intended at most to elicit testimony that was already in substance before the jury.

I do not think it was error to exclude an answer to the question as follows: " Can you tell the jury any reason why your coat is cut and there are no cuts on your body ? " The coat is present in this court and has been examined by the members of the court and it appears from such cuts that they were slight in extent and that they did not extend through the lining of the coat. The suggestion in the prevailing opinion that the defendant may have answered this question by stat-

ing that he wore an unusually thick woolen shirt, or that the knife struck a button or that he might have given some other special fact in explanation of his body not being cut is quite imaginary. The appearance of the coat itself answers beyond controversy any suggestion that there was any special and peculiar reason why his person was not cut.

It is to be expected that judges will differ to some extent in the use of language in expressing their thoughts and also in their conception of the relative importance of events in any controversy. If a trial judge correctly quotes from and refers to the evidence received during a trial and accurately states the law applicable thereto, the judgment entered upon the verdict of a jury should not be reversed because an appellate court in the quiet and deliberate examination of the case is of the opinion that the trial court could have so framed the charge as to have given greater prominence to some of the evidence than was given by him to such evidence and thus possibly have saved the defendant from a conviction of a crime as serious in its consequences as that of which he was convicted. If the particular language of a trial court is to be considered and the relative amount of time taken by the court upon the different branches of the case in charging the jury is to be measured except for the one purpose of determining whether the defendant has had a fair trial, it will be practically impossible for any trial court to satisfy a court upon appeal where there is a difference of opinion as to the weight of evidence upon the questions submitted to and determined by the jury. The reversal in this case is based more upon dissatisfaction with the determination of the jury than it is upon any substantial error committed by the trial court.

The judgment of conviction should be affirmed.

EDWARD T. BARTLETT and HISCOCK, JJ., concur with VANN, J.; WERNER, J., concurs in result on the ground that the trial judge's instructions to the jury on the subject of manslaughter in the first degree, although technically correct so far as they go, were insufficient in view of the peculiar circumstances of this case; CULLEN, Ch. J., and GRAY, J., concur with CHASE, J.

Judgment of conviction reversed and new trial ordered.