## UNITED STATES v. THOMPSON.

United States District Court,
S. D. New York.
Dec. 15, 1953.

J. Edward Lumbard, U. S. Atty., for Southern Dist. of N. Y., New York City, for the United States. Lloyd F. Mac-Mahon, Chief Asst. U. S. Atty., and J. B. Kilsheimer, III, Asst. U. S. Atty., New York City, of counsel.

Mary Kaufman and Robert Z. Lewis, New York City, for respondent.

NOONAN, District Judge.

This proceeding was instituted on September 9, 1953 by an order requiring Robert G. Thompson, the respondent, to show cause why he should not be punished for criminal contempt of this court. 18 U.S.C. § 401; Rule 42, Federal Rules of Criminal Procedure, 18 U.S.C.

Following respondent's arraignment and the entry of a plea by him of not guilty, trial was had to the court without a jury on December 8th and December 9th, 1953, (Rule 42(b), Federal Rules of Criminal Procedure; 18 U.S.C. § 3691; U. S. v. United Mine Workers of America, 330 U.S. 258, 298, 67 S.Ct. 677, 91 L.Ed. 884). At the end of the government's case, respondent moved to strike certain testimony and also moved for judgment of acquittal.

We shall consider first the evidence presented on the trial.

The respondent, Thompson, is one of the eleven defendants in the case of U. S. v. Dennis, (Indictment #C128/87), whose conviction, under the Smith Act, to teach and advocate the violent overthrow of the Government of the United States was affirmed by the Court of Appeals of this Circuit, 183 F.2d 201; and the Supreme Court of the United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137. At the conclusion of such trial, Thompson was sentenced to three years imprisonment and fined $10,000. Thereafter, the Court of Appeals, on November, 2, 1949, fixed bail for Thompson in the sum of $20,000 and he was enlarged accordingly. Respondent, Thompson, executed a bond in such penal amount and was re-

leased on November 3, 1949. Such bond contains, in part, the following language:

"Now the conditions of this recognizance are such that (the respondent) shall abide by and obey all orders made in said cause and shall surrender himself in execution of the judgment and sentence appealed from upon such day as the District Court of the United States for the Southern District of New York may direct, if the judgment and sentence appealed from shall be affirmed, and shall appear before the District Court of the United States for the Southern District of New York on such day or days as shall be sent (sic) for a retrial of said cause providing the judgment of the District Court of the United States for the Southern District of New York is reversed by the said United States Court of Appeals; and shall not depart the jurisdiction of the District Court of the United States for the Southern District of New York without leave * * *".

On November 10, 1949, Judge Bondy of this Court entered an order extending the bail limits for Thompson to the Eastern District of New York on his sworn application that his place of residence was located at 3940—46th Street, Long Island City, New York. The latter order provides that Thompson "will return to the Southern District of New York whenever ordered by this court so to do."

Upon the affirmance of his conviction by the Court of Appeals for this Circuit on August 1, 1950, the government sought revocation of his bail. The motion was granted with leave to the defendants in the Dennis case to apply to the Circuit Justice for continuance of bail. This application was granted by Mr. Justice Jackson, the Circuit Justice, and the respondent, and his co-defendants, were continued on bail pending an application for certiorari and, if granted, pending final disposition of the case by the Supreme Court. Williamson v. U. S., 2 Cir., 184 F.2d 280.

Respondent's conviction was thereafter affirmed by the Supreme Court on June 4, 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137. Thus the mandate of the Supreme Court, unless stayed, would come down to the District Court twenty-five days after the Supreme Court's decision, namely, June 29, 1951. Sup.Ct. Rule 34, 28 U.S.C. On June 22, 1951 an application to stay the mandate and continue respondent on bail was denied by Mr. Justice Jackson. On that date, Thompson was interviewed in New York by Agents of the Federal Bureau of Investigation.

On June 28, 1951, the government prepared and served upon counsel in the Dennis case an order on mandate with notice of settlement in usual form. Harry Sacher, an attorney for certain of the defendants in the Dennis case, accepted service for Thompson's attorney. The order on mandate with notice of settlement contained an express provision requiring all the defendants in the Dennis case personally to surrender to the United States Marshal for the Southern District of New York on July 2, 1951, at 10:30 A.M. On June 29, 1951, after service of the proposed order on mandate, Mr. Sacher requested the United States Attorney to adjourn the surrender of all of the defendants until after July 4, 1951, to "allow these men to spend the last holiday, which would be available to them for some years * * * with their wives and children * * *".

This request was denied and Mr. Sacher thereupon appeared before Judge Ryan of this court in support of two proposed orders to show cause affecting the sentences previously imposed on all of the defendants in the Dennis case. Mr. Sacher stated to Judge Ryan at that time: "You have my word that all of these defendants will be here at that time". (Referring to Monday morning, July 2, 1951).

Upon questioning by the court, Mr. Sacher advised Judge Ryan:

"the only basis on which I could make any statement or promise to

the court was the promise of my clients and the others to appear".

Following his departure from the courthouse on June 29, 1951, Mr. Sacher went to Communist Party Headquarters, located at 35 East 12th Street, where he told Henry Winston, Gilbert Green, Gus Hall and the other defendants in the Dennis case to appear in court on Monday morning, July 2, 1951.

Mr. Sacher's statement as to whom he saw at 35 East 12th Street, at the time just referred to, is unequivocal insofar as Winston, Hall and Green are concerned. His recollection of having seen Thompson there at that time is couched in the phrase: "I may have". But the demonstrable fact is that Thompson was at 35 East 12th Street at that time. Abner Green, one of the sureties on Thompson's bail bond stated that he saw Thompson with Gilbert Green at Communist Party Headquarters; Mr. Sacher went to Communist Party Headquarters after being in court on the afternoon of Friday, June 29, 1951. So did Abner Green, one of Thompson's sureties. The only logical inference to be drawn from these facts is that Thompson and his co-defendants in the Dennis case were together at Communist Party Headquarters. This is clear from Mr. Sacher's testimony that he "advised that they all should be present" in court on July 2, 1951, and he "was assured that they would be".

On July 2, 1951, Thompson and three of his co-defendants (Winston, Green and Hall) failed to appear for surrender, whereupon Judge Ryan signed the order on mandate and the remaining seven defendants surrendered. The only difference in the order served upon counsel, and the one signed, was that Judge Ryan changed the time for surrender from 10:30 A.M. to 11:05 A.M. The pertinent provision of Judge Ryan's order upon which this proceeding is predicated reads as follows:

"Further Ordered, Adjudged and Decreed that the defendants personally surrender to the United States Marshal for the Southern District of New York, in Room 318, United States Courthouse, Foley Square, New York, N. Y., on the 2nd day of July, 1951, at 11:05 o'clock in the forenoon of that day."

On July 2, 1951, Thompson's residence was 3940—46th Street, Long Island City, New York. Thus, the Marshal went to that address on the afternoon of that date in order to execute the warrant of arrest but was unable to do so for, while he found Thompson's name on the doorbell, he could not find Thompson himself.

On June 13, 1951, Thompson had left his home in Long Island City, and moved to the Riverside Plaza Hotel in Manhattan. Although he registered under his own name, his home address was not completely given. The registration card shows that he signed "R. Thompson" and listed his home address as "3940—LIC, NY". The manager of the hotel, the desk clerk, and a guest all testified that they had seen Thompson at the hotel.

On Sunday, July 1, 1951, Thompson was seen leaving the hotel with a negro man answering the description of Henry Winston. The testimony shows that Thompson had been seen in and about the hotel with Winston on other occasions between June 20th and June 24th, 1951. Thompson did not check out, but left all of his personal belongings in his room. He failed to pay his hotel bill and never was seen again at the Riverside Plaza Hotel.

Thompson was apprehended on August 27, 1953, by Agents of the Federal Bureau of Investigation. This was more than twenty-five months after the making of the order of July 2, 1951. At the time of his arrest he was in the company of other known fugitives in a mountain cabin located in an isolated area in California. The cabin was surrounded by large redwood trees and was located one and one-half miles off the main road, 200 yards from a mountain road, and at the end of a dead end trail.

Before Thompson's disappearance in 1951, he had long dark brown hair parted on the side, brown eyebrows, no mustache and weighed between 180 and 185

lbs. At the time of his being found by the Agents of the Federal Bureau of Investigation, Thompson had a crew-cut, had grown a mustache and had dyed his hair, eye-brows and the mustache red. He had also gained about 40 lbs. in weight.

At the time of his arrest, Thompson had nothing in his possession indicating his true identity, and refused to admit who he was. He did, however, have in his possession or on his person a number of documents indicating that he was a John Francis Brennan. It was not until he had been taken to the San Francisco office of the Federal Bureau of Investigation, that Thompson admitted his true identity by signing a receipt for money taken from him by the Agents. It is not necessary to detail the plan utilized by Thompson to make himself known as John Francis Brennan, a man who had died in 1938 and who, like Thompson, was a veteran of the Abraham Lincoln Brigade.

Thompson did not testify and he offered no witnesses to controvert the foregoing evidence. This court has given no consideration to the fact that the defendant failed to testify.

■ There can be no question as to the court's power to enter the order on mandate, nor that such order required Thompson to surrender to serve his sentence. Nor that Thompson failed to obey the order. It cannot be disputed that if Thompson had notice or knowledge of the surrender order, he wilfully failed to obey it. The undisputed evidence as to his disguise, his adoption of the identity of a dead man, his flight across the country, the varied addresses, all false, which he gave, points conclusively to a conscious and wilful attempt to avoid jail. The only question is whether or not Thompson knew of the surrender order. If he knew of the surrender order and wilfully flouted it, he is guilty of the charge of contempt here made against him. That this court has the power to punish for such contempt is now beyond question. U. S. v. Hall, 2 Cir., 198 F.2d 726, 730, certiorari denied 345 U.S. 905, 73 S.Ct. 641, 644.

In the Hall case, the Court of Appeals said:

"On this record, therefore, we think the court was eminently justified in finding as a fact that respondent had complete notice of the order and willfully disobeyed it. The inference not only was well within the area permitted to a trier of facts, but was indeed one highly reasonable if not compelled. However heavy the evidential burden on the prosecution here, it can hardly be held more exacting than the 'proof beyond a reasonable doubt' of an ordinary criminal case before a jury. We have been often pressed, but have consistently refused, to apply this formula to each link in the chain of alleged events in order that if as to any the proof is not thus overwhelming there must be a reversal of a verdict of guilt. Instead we have said that the process of drawing inferences is to be governed, as ordinarily, by human experience, that indeed no other rule of jury fact finding has a claim to reality, and that the strict requirement as to burden of proof constitutes an over-all admonition or warning, rather than a precise yard-stick to be applied to each isolable segment of the proof."

This language furnishes the definite yard-stick which must be kept before us, in an analysis of the evidence adduced by the government, and in determining whether or not the respondent is guilty of the contempt as charged.

It certainly was apparent to all of the defendants in the Dennis case, including Thompson, that following the affirmance of their conviction under the Smith Act by the Supreme Court on June 4, 1951, they would be required to surrender as soon as the mandate was filed in the District Court. If this is not so, why was a stay of mandate applied for on June 22, 1951? Upon the filing of the mandate, Judge Ryan entered the usual order on

July 2, 1951. Certainly Thompson was on notice that on the affirmance of his conviction, the District Court would "direct" him to surrender, inasmuch as the bail bond which he signed on November 3, 1949 contained a provision that Thompson would "surrender himself in execution of the judgment * * * on such day * * * as the District Court of the United States for the Southern District of New York may direct." Despite the obvious, Thompson left his home in Long Island City nine days after the affirmance of his conviction by the Supreme Court, and moved into the Riverside Plaza Hotel. Is it too far-fetched to say that he had in mind that he could come and go as he pleased while a guest at the hotel and could conceal his escape from a place in midtown Manhattan more readily than from his home in Long Island? As has been stated before, while staying at the hotel he was seen with Winston, a co-defendant in the Dennis case, who also failed to surrender on July 2, 1951. The undisputed fact is that he was seen leaving the hotel with Winston on Sunday morning, July 1, 1951.

The defense argues that Mr. Sacher did not see Thompson, after Mr. Sacher had appeared in court on June 29, 1951. Even if we assume that to be so, for the sake of argument, it seems beyond doubt that Thompson was notified of the surrender order before Mr. Sacher appeared in the courthouse on June 29, 1951.

It is conceded that the government served, and Mr. Sacher accepted, on June 28, 1951, a proposed order on mandate requiring Thompson and his co-defendants to surrender on July 2, 1951. We wish to make it clear at this point that we have drawn no inference from the service of this proposed order, and notice, upon Mr. Sacher, for in and of itself it was not personal notice to the defendant of the steps taken by the government, U. S. v. Hall, D.C., 101 F.Supp. 666. However, on June 29th, when Mr. Sacher appeared before Judge Ryan, he assured the court that all of the defendants in the Dennis case would be present in court on Monday, July 2, 1951, and when asked about the basis for his assurance to this effect, Mr. Sacher replied:

"the only basis on which I could make my statement or promise to the court was the promise of my clients and the others to appear."

From this it seems perfectly plain that Mr. Sacher made the assurance to the court that he did because he had been in communication with all of the defendants including, specifically, the respondent, Thompson. Furthermore, it seems apparent that Thompson was notified of the order in question from the fact that prior to Mr. Sacher's appearance in court on June 29, 1951, he had made an effort on behalf of all of the defendants, including Thompson, to postpone the entry of the surrender order beyond July 4th so that all of the defendants, including Thompson, could "enjoy the last holiday which would be available to them for some years * * *". At Communist Party Headquarters, following his appearance in court on June 29th, Mr. Sacher talked to the defendants. He did not deny that he saw Thompson at that time but stated "I am not certain about Thompson", and, "I may have seen him".

The testimony of Abner Green fills in any possible deficiency in Mr. Sacher's testimony as to his uncertainty about seeing Thompson. It is uncontradicted that Thompson and Gilbert Green were present at Communist Party Headquarters between 4 and 4:30 P.M. on June 29, 1951. Mr. Sacher specifically recalled notifying Gilbert Green. The conclusion seems inescapable that he notified Thompson as well.

It seems clear that Thompson, a leader of the Communist Party, was with the other co-defendants in the Dennis case when they were notified to be present on July 2, 1951. We would be blind to the realities of the situation if, in the face of the evidence presented, we should say that Thompson, having so much in common with the others present in Com-

munist Party Headquarters at the time mentioned above, would have no interest whatsoever in what was going on and that he was not notified that he was to be present in court on July 2, 1951. The inference is compelled that he knew what every other one of them knew. Reason and logic admit of no other conclusion.

Thompson's flight, when added to the notice he received at Communist Party Headquarters, indicate that he became a fugitive from the surrender order.

■ It is, of course, well-settled that evidence of flight is ordinarily "of slight value, and of none whatever unless there are facts pointing to the motive which prompted it". People v. Fiorentino, 197 N.Y. 560, 567, 91 N.E. 195, 198. But here, significantly, it was not until the order was entered that Thompson falsified his identity and effected his disguise. It was not until after the order was made that he left the jurisdiction of this court. We would be blindly resistant to realities if we were to ignore the fact that Thompson had remained in New York over one and one-half years while on bail, and yet departed within twenty-four hours of the order of surrender. This was certainly no coincidence.

■ Ample proof has been offered in this case to justify the inference that Thompson was in flight from the order directing his surrender. To find that he was a fugitive from justice but did not know of the existence of the order of the court directing his surrender would ignore the uncontradicted evidence. Therefore, viewing the evidence as a whole, I find that it has been established beyond a reasonable doubt that the respondent Thompson had notice and knowledge of the order of July 2, 1951 made by Judge Ryan and that he wilfully and contumaciously disobeyed the terms of that order.

■ . The motion to strike certain testimony made by the respondent at the close of the trial is denied. The test to be applied in determining this motion has been set forth in U. S. v. Werner, 2 Cir., 160 F.2d 438, 443, where the court said:

"* * * once more we repeat that the probative remoteness of testimony is never alone an absolute reason for its exclusion, but should always be accompanied by some other objection if it is to prevail; such as the confusion which may result or the emotions it may arouse to disturb impartial decision. So long as the entirely discretionary admonition to keep the trial within practical limits is treated as a peremptory rule, so long will trials continue to go astray; in cases of any doubt the right course is not to exclude."

See also U.S. v. Pugliese, 2 Cir., 153 F.2d 497, 500, and U. S. v. Grayson, 2 Cir., 166 F.2d 863, 870.

The respondent is, therefore, found guilty of the charge of contempt preferred against him, and his motion for judgment of acquittal is denied.

It is directed that the contemnor be produced in court on Wednesday, December 16, 1953, at 11:30 A.M. in Room 618, for sentence.