**UNITED STATES of America,**
**Appellee,**

v.

**Robert G. THOMPSON, Appellant.**

**No. 126, Docket 25245.**

United States Court of Appeals
Second Circuit.

Argued Nov. 5, 6, 1958.

Decided Dec. 2, 1958.

Mary M. Kaufman, New York City, for appellant.

Joseph P. Altier, Asst. U. S. Atty., S. D.N.Y., New York City (Arthur H. Christy, U. S. Atty., and Mark F. Hughes, Jr., Asst. U. S. Atty., New York City, on the brief), for appellee.

Before CLARK, Chief Judge, WATERMAN, Circuit Judge, and GALSTON, District Judge.

CLARK, Chief Judge.

Appellant is one of the four defendants who fled from the jurisdiction upon the affirmance in Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, of their convictions for conspiracy to violate the Smith Act. The first of these defendants to be apprehended was Hall, who was seized in Texas in a few months and found guilty by Judge Ryan of a criminal contempt, United States v. Hall, D.C.S.D.N.Y., 101 F.Supp. 666, which we affirmed, 2 Cir., 198 F.2d 726, and the Supreme Court denied certiorari, 345 U.S. 905, 73 S.Ct. 641, 97 L.Ed. 1341. Next this appellant was seized in California some 27 months later; he was found guilty of criminal contempt and sentenced to 4 years' imprisonment by Judge Noonan, United States v. Thompson, D.C.S.D.N.Y., 117 F.Supp. 685; we affirmed, 2 Cir., 214 F.2d 545, and the Supreme Court denied certiorari, 348 U.S. 841, 75 S.Ct. 48, 99 L.Ed. 663. Thereafter and nearly 5 years after their escape, Green and Winston surrendered, notifying the press in advance of their intent to do so. They, too, were found guilty of criminal contempt. See United States v. Green, D.C.S.D.N.Y., 140 F.Supp. 117, per Dawson, J. We affirmed, 2 Cir., 241 F.2d 631, and, certiorari having been granted, Green v. United States, 353 U.S. 972, 77 S.Ct. 1057, 1 L.Ed.2d 1135, the Supreme Court in turn affirmed, but by a sharply divided court, 356 U.S. 165, 78 S.Ct. 632, 2 L.Ed.2d 672. The present motion to vacate the conviction or correct the sentence under 28 U.S.C. § 2255 and F.R. Crim.P., Rule 35, admittedly presents no new issues, but asks us to re-examine the record in the light of the several

opinions, including the two sharp dissents for four members of the Supreme Court, in the Green case. Judge Palmieri has denied the application.

■ At the outset the United States vigorously challenges the right of the defendant to obtain a review in this proceeding of matters fully considered and adjudicated on the previous appeal. The extent of review available on this motion —the modern equivalent of a writ of error coram nobis—has not been explicitly stated by the Supreme Court, although it seems clear that the motion is broadly available to correct an injustice in a conviction or sentence. Thus had the Court in the Green case adopted the view of its minority that a judge lacks power to inflict punishment for criminal contempt by way of summary proceeding and that the defendants were entitled to be tried by a jury after indictment by a grand jury, we should not doubt both our power and our duty to apply that principle to Thompson's case now. The Court, however, affirmed, and thus this appeal can do no more than retest the evidence upon which Judge Noonan acted in holding Thompson to have had knowledge of the district court order he disobeyed by flight. It does seem to us that such re-review of the evidence is not a right to be accorded in this proceeding and that it can produce only confusion and discrimination among defendants if execution of a judicial mandate is thus to be delayed in the hope of inducing some judicial vacillation. See, e. g., cases such as McGuinn v. United States, 99 U.S.App.D.C. 286, 239 F.2d 449, certiorari denied 353 U.S. 942, 77 S.Ct. 818, 1 L.Ed.2d 762; Herman v. United States, 4 Cir., 227 F.2d 332; United States v. Rosenberg, 2 Cir., 200 F.2d 666, 668, certiorari denied Rosenberg v. United States, 345 U.S. 965, 73 S.Ct. 949, 97 L.Ed. 1384; United States v. Walker, 2 Cir., 197 F.2d 287, certiorari denied Walker v. United States, 344 U.S. 877, 73 S.Ct. 172, 97 L.Ed. 679. Here the other fugitives have served or are serving their sentences. So the defendant, who has been on bail, granted to await the outcome of the Green and Winston cases after serving a part of his sentence, and whose conduct appears more continuously contumacious than that of the others, might well receive an unfair reward for his persistence.

Nevertheless we have chosen to reexamine the record because the opinions in the Green case do prompt to careful study and because we wish to satisfy ourselves, since the earlier affirmance was by a different panel of this court. And upon such examination we are clear that Judge Noonan's findings find support in the actual testimony before him and the reasonable and rational inferences which he as a trier of facts properly drew from the evidence. The main issue of course is whether Thompson knew in fleeing from the jurisdiction that the proposed surrender order of July 2, 1951, had actually been entered. This is not a matter of *constructive notice,* as has at times been said; whatever notice should have been given Thompson was supplied by the marshal, who went to his home to serve the warrant of arrest on the afternoon of July 2 and found him missing. It is thus a question of actual knowledge of the order's entry proven circumstantially.

We shall not detail all the evidence which Judge Noonan has carefully summarized in his opinion, D.C.S.D.N.Y., 117 F.Supp. 685. Thompson's original bail bond in 1949 contained his explicit agreement to surrender upon affirmance; but when the affirmance came, and nine days later on June 13, 1951, Thompson left his home in Long Island City and moved under circumstances of semiconcealment (using his name, but with a garbled address) into a mid-Manhattan hotel. Here he stayed until sometime on Sunday, July 1, 1951, being seen there that day, though he did not sleep there that night, leaving without paying his hotel bills and abandoning his personal belongings, including suits and a toothbrush. Unlike the other fleeing defendants, however, he is shown to have remained in or around New York City

for a time as we shall develop below. Meanwhile the Government served upon his counsel on June 28 an order on mandate in complete form, with direction to surrender to the United States Marshal on Monday, July 2, together with notice of its proposed settlement before the court. His counsel appeared in court on June 29 and tried unsuccessfully to have the surrender postponed until after July Fourth. Judge Noonan's analysis of the evidence concluding that Thompson was notified of the proposed surrender order even before the court hearing on June 29, 117 F.Supp. 685, at pages 686–687, 689–690, represents entirely reasonable deductions which we accept. Armed with this knowledge Thompson then went into complete concealment until he was apprehended.

Thompson's apprehension on August 27, 1953, came in a secluded and remote cabin at the end of a dead-end trail located in an isolated area of the Sierra Mountains of California. He had completely disguised his appearance and he continued to deny his identity until after his fingerprints had shown who he was. From various papers found upon him it appeared that he had assumed the character of one John Francis Brennan, then deceased; and the Government, aided by them and the leads they gave, has been able to construct much of his journey west and his progress in disguise. Thus we know that he remained in and about New York for about a month after his formal disappearance. In Brennan's name he applied for a New York Motor Vehicle operator's license at the Nassau office of the Commissioner of Motor Vehicles. He took a driving test on July 31 before an examiner, which he passed, receiving his license on August 1, 1951. The papers show no substantial disguise at this point. On August 29, 1951, he was obtaining membership in a union in Trenton, New Jersey. On October 11 he obtained a Pennsylvania operator's license in Philadelphia; and from here his appearance began to, and did, change markedly. In April 1952 he obtained a temporary license in Chicago;

in May 1953 a Missouri fishing permit in St. Louis; and in August 1953 a Montana fishing license in Bigfork, Montana. All of these were in the name of Brennan.

This recital presents significant facts. Thus unlike the other fugitives he is shown to have remained in the jurisdiction, albeit in substantial concealment, until well past the date of entry of the surrender order. That order and its violation was a matter of wide public interest and notoriety, being front-page news for the daily papers, so that Thompson could hardly avoid knowledge if he so desired. But in due course he felt a compulsion for flight under circumstances of the utmost concealment. Since he had stayed on past the time of surrender, the inference of fact seems justified that his situation was becoming sufficiently precarious to lead him to seek greater concealment at a distance. Unless he realized that the order of surrender named him, his natural course was to continue to remain in New York to await developments. There was no countervailing evidence of any kind to cast doubt upon the inferences the court drew. We think they were rational and reasonable.

Certain grounds of differentiation from the Green case are urged because there the majority referred to certain admissions made by Green and Winston in announcing their intended surrender, thus recognizing that they were fugitives from justice, that they must enter prison to serve their sentences, and that they were to surrender at the Marshal's office. But if absolute proof is to be required, and the normal processes of inference rejected, all this proves no more than knowledge of the intended course of judicial action, not that it had necessarily been carried out. Thus the proof seems to us no stronger than here, and probably not as strong, since Green and Winston had apparently fled the jurisdiction before the order was entered. As the dissenting justice says: "The petitioners had absconded by July 2, and the record is completely silent as to their

whereabouts from June 29 until they surrendered almost five years later." Green v. United States, 356 U.S. 165, 221, 78 S.Ct. 632, 663, 2 L.Ed.2d 672. The Green holding, therefore, is itself one which upholds the drawing of rational inferences.

We have often upheld the drawing of such inferences as a necessary part of the judicial process in criminal cases, as well as civil. See, e. g., United States v. Masiello, 2 Cir., 235 F.2d 279, 284, 285, certiorari denied Stickel v. United States, 352 U.S. 882, 77 S.Ct. 100, 1 L.Ed.2d 79; United States v. Moia, 2 Cir., 251 F.2d 255, 258; United States v. Hines, 2 Cir., 256 F.2d 561, 564; Holland v. United States, 348 U.S. 121, 139, 140, 75 S.Ct. 127, 99 L.Ed. 150. It is hard to see how the process of fact finding can go on unless the trier may make the deductions which experience teaches are reasonable and justified. And the process does not differ in criminal and in civil cases, except that the over-all burden of proof to convince is stated in terms of greater admonition in the former than the latter. But what flight and disguise tell under circumstances suggesting a natural compulsion thereto is not to be rejected in a criminal case any more than in a civil case. One cannot doubt the serious question of public policy raised by the use of summary proceedings under the circumstances. A change in the now announced law to require indictment and jury trial may well be socially desirable, as suggested in, e. g., 72 Harv.L.Rev. 153–155, though it is to be noted that the statute making bail jumping a crime, passed by Congress as a direct response to these flights, 18 U.S.C. § 3146, expressly preserves the contempt power. But in any event we should not contest the policy approved by the Supreme Court's majority through the guise of making the course of judicial proof unrealistic and incapable of operation. Here it is obvious that there can almost never be direct proof of a fugitive's knowledge of the final entry of a surrender order against him. He has fled and that is all we are likely to know when he actually gets away. Indeed if the public authorities knew more they would quickly apprehend him. It is true that public policy is often enforced through the guise of procedure, but a use of procedure to run counter to policy is both confusing and discriminatory. At any rate for us as an intermediate court we must accept the announced policy and review the evidence by normal standards.

Affirmed.