UNITED STATES of America, Plaintiff-Appellee,

v.

Peter CASTELLANA, David Newman, Joseph Pagano, Gondolfo Sciandra, Joseph Weinberg, Stanley Weinberg, and Pride Wholesale Meat & Poultry Corp., Defendants-Appellants.

No. 526, Docket 29602.

United States Court of Appeals Second Circuit.

Argued June 17, 1965.

Decided July 19, 1965.

Hays, Circuit Judge, dissented in part.

Nathan Kestnbaum, New York City, for defendants Castellana, Sciandra, and Pride Wholesale Meat & Poultry Corp.

Samuel D. Pressman, New York City, for defendants Newman, Joseph Weinberg, and Stanley Weinberg.

Daniel H. Greenberg, New York City, for defendant Pagano.

Albert J. Gaynor, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, J. Edward Meyer III, Bernard W. Nussbaum, John S. Martin, Jr., Asst. U. S. Attys., on the brief), for plaintiff-appellee.

Before KAUFMAN, HAYS and MARSHALL, Circuit Judges.

KAUFMAN, Circuit Judge:

The six individual defendants before us appeal their convictions on all 8 counts for violating and conspiring to violate the federal bankruptcy fraud statute, 18 U.S.C. §§ 152, 371. The sole corporate defendant, Pride Wholesale Meat & Poultry Corp., appeals from the conviction entered against it on the conspiracy count, the only offense with which it was charged, after a six-week jury trial in the Southern District of New York.[1]

The conspiracy count charged that all seven defendants agreed, knowingly and fraudulently, to transfer property and monies of Murray Packing Co., Inc. ("Murray"), valued at appoximately $1,-300,000, in contemplation of a bankruptcy proceeding involving Murray, or with intent to defeat the bankruptcy laws. The indictment's seven substantive counts charged that, from March 20, 1961, to March 29, 1961, Pagano, with the other five individual defendants acting as principals and aiders and abettors, fraudulently transferred $747,000 from Murray to his own account. We conclude that the evidence was more than sufficient to enable a reasonable jury to find the appellants guilty as charged and that no prejudicial errors were committed in the admission of evidence or in the court's charge. We therefore affirm all convictions.

Stripped to essentials, the conspiracy was initiated when Pagano took over control of Murray, then owned and managed by Newman and the Weinberg defendants, at a time when the meat pack-

---

1. The sentences were as follows:
 Castellana—5 years on each count, to run concurrently; $10,000 fine on conspiracy count; $5,000 fine on each substantive count; defendant to stand committed until total fine is paid or he is otherwise discharged by law.
 Newman—15 months on each count, to run concurrently.
 Joseph Weinberg—1 year on each count, to run concurrently.

 Stanley Weinberg—1 year on each count, to run concurrently.
 Gondolfo Sciandra—18 months on each count, to run concurrently.
 Pagano—5 years on each count, to run concurrently; $10,000 fine on conspiracy count; $5,000 fine on each substantive count; defendant to stand committed until total fine is paid or he is otherwise discharged by law.
 Pride Wholesale Meat & Poultry Corp. —$10,000 fine.

ing company was in dire financial straits. Shortly thereafter and through Pagano's efforts, defendant Castellana and his company, Pride, began to buy meat in huge quantities from Murray, often paying less than the billed price and on many occasions less than the cost of the goods to Murray. Similar cut-price purchases were made by G. S. Food Dealer, a company formed by defendant Sciandra to assist in bankrupting Murray. Corresponding with these increased sales, Pagano, Newman, and the Weinbergs escalated their purchases of meat provisions, assuring Murray's suppliers that payment would be forthcoming. These assurances were intended to lull the creditors into a sense of security during a period when Pagano was (within the space of less than ten days) withdrawing some $747,000 in cash from Murray's bank accounts. Moreover, the funds were siphoned from the accounts via Pride's reduced payments on Murray's bills. These payments more than coincidentally coincided with Pagano's withdrawals. With Murray's assets thus depleted, the company passed into insolvency and ultimately bankruptcy, but not before the defendants, after tentatively offering the suppliers a settlement of forty cents on the dollar, fraudulently transferred an additional $112,000.

## I.
### Sufficiency of the Evidence

We reject, at the outset, defendants' challenges to the sufficiency of the Government's proof. It is well-established that once the trier of fact has returned a guilty verdict, the evidence must be viewed "most favorably to [the Government], which includes * * * the indulgence in all permissible inferences in its favor." United States v. Marchisio, 344 F.2d 653, 662 (2 Cir. April 9, 1965). Applying this standard to this case, we cannot avoid the conclusion that reasonable jurors could have been convinced beyond a reasonable doubt that each of the individual defendants was guilty of "knowingly and fraudulently" transferring or concealing Murray's property "in contemplation of a bankruptcy proceeding * * * or with intent to defeat the bankruptcy law." We believe that for us to test the evidence by any other standard would be an invasion of the jury's function to choose between competing inferences of fact.

The following narrative summary of the more than 3,000 pages of testimony in this factually complicated case will serve to reveal the essential details of the scheme and participation of each appellant. Murray, with headquarters in the Bronx, New York, was incorporated in December 1959, with David Newman as president and Stanley Weinberg as secretary-treasurer; the two, together with Stanley's parents, Mr. and Mrs. Joseph Weinberg, and Newman's wife comprised the Board of Directors. Stanley was office manager of the new wholesale venture, in charge of bookkeeping, payments and deposits; Newman supervised poultry purchases and sales; and Joseph directed the veal, lamb and beef departments. By late 1960, within less than a year of its organization, Murray was experiencing serious financial difficulties, having lost much money and being in need of new markets and capital to improve its profit margin. In fact, the company's bank refused to make any loans because the weak capital base of $125,000 supporting annual sales of approximately $3 million overextended Murray's financial structure.

At this time, Joseph Pagano—who until then played a minor role as salesman for Mercury Hotel & Restaurant Supply Corp., a small company owned by Murray and specializing in supplying meat and provisions to nightclubs and camps— moved to the center of the stage. Through his efforts, and despite Murray's undercapitalized corporate being, the company obtained, on December 2, 1960, an $8,500 loan from Jo-Ran Trading Corp., of which defendant Peter Castellana was president and joint-owner. The interest rate was set at the extraordinarily high rate of 1% per week, with the principal to be repaid in three months. Pagano and Stanley

Weinberg co-signed the interest payment checks on behalf of Murray as well as the check covering the principal, which was paid on March 24, 1961, three weeks tardy. The overdue payment came at a time when, according to the Government's proof, Pagano had already withdrawn $185,000 from Murray's bank accounts, thus contributing to the company's impending insolvency.

Pagano's signature on the various checks is explained by an even more significant series of events in late 1960 and early 1961 which terminated in Pagano achieving the dominant position in the Murray operation. While working as a Mercury salesman, Pagano approached Newman and the Weinbergs, proposing that he acquire an interest in Murray in return for a comparatively nominal investment and assurances that he would substantially increase the company's sales and profits by obtaining new customer accounts. For $35,000, he purchased a one-third stock interest in Murray, replaced Newman as corporate president, and was authorized to sign all Murray checks. These arrangements, formally approved at a joint directors' and stockholders' meeting on January 31, 1961, were supplemented by intra-corporate accord which gave Pagano a signatory right on all Murray checks and "sole management and control" of the business.

Simultaneously, and due to Pagano's connections, a series of meetings was held between Pagano, Newman, the Weinbergs and Castellana in which the latter agreed that Pride Wholesale Meat & Poultry Corp., which operated a chain of wholesale and retail stores in the New York metropolitan area, would substantially step up its meat and poultry purchases from Murray, which for the month of November 1960 had approximated only $1,000. During these discussions the parties informally agreed that Murray, thereafter would bill Pride at only one-half cent per pound over Murray's own cost. Pursuant to these arrangements, dealings between the two companies rose rapidly to a point where, in March 1961, Murray was selling Pride about $922,000 out of approximately $1,437,000 in total monthly sales and this resulted in almost 80% of Pride's total purchases in that month—$922,000 out of $1,161,000—being made from Murray.[2] Indeed, the relationship between the two companies became so interdependent that in the same month of March one financier, terming it "dangerous," refused to factor Murray's accounts receivable in the future.

As Murray-Pride business dealings assumed this symbiotic character, Castellana began to take sizable, frequent price reductions when he paid Murray's bills. Thus, the prosecution's detailed, methodical proof showed that of the 315 Murray-Pride transactions in March 1961, 114 represented instances where Castellana paid a total of $78,000 less than the billed price; in at least 54 instances the Government was able to show that Pride's payments did not even equal Murray's cost of goods sold.[3] Although Newman and the Weinbergs belatedly claimed that this price-cutting was unau-

---

2. The Government's proof established that Pride's March purchases from Murray almost doubled those for February. The jury could reasonably reject Castellana's claim that this increase was traceable to the Easter-Passover season, for it was shown that during the same seasons in 1960 and 1962 Pride's purchases actually declined when compared with the preceding months. Moreover, in November 1960 Murray sold to Pride only about $1,000 of its approximate $258,000 total sales and for December 1960 sales to Pride amounted to about $139,000 of a gross volume of about $340,000.

3. In January 1961 there were, according to the Government's proof, 128 transactions between Murray and Pride, with Castellana taking 92 price reductions totaling about $5,000. More significantly, the pattern of reductions increased markedly during the period from March 20 to March 29, 1961, when Pagano was withdrawing large sums from Murray's bank accounts. The weekly figures were as follows: March 3—5 reductions out of 54 transactions; March 10—45 out of 125; March 17—29 out of 58; March 24—35 out of 49.

thorized, Stanley Weinberg—after learning that the reductions were permissible if "okayed" by Pagano—issued credit memoranda authorizing Pride to pay less than the price on Murray's invoices. Stanley further admitted in certain pretrial statements that he knew at the time "it [did] not make sense to sell * * * at this price" and that "no company" could continue in business if it took such losses. On his part, Joseph Weinberg could recall no basis for the reductions and no effort to seek a corresponding reduction from his processor-suppliers. On the other hand, Castellana—the only defendant to testify at the trial—painstakingly sought to justify each particular price reduction by pointing to such considerations as defective condition or late shipment. This testimony was counterbalanced, however, by Castellana's admission that he made no notes concerning the reasons for the reductions at the time they were taken; and in the bankruptcy hearings approximately three years previously he was unable to give any reasons for the price reductions.

Before turning to the critical March 1961 withdrawals by Pagano, one additional phase of the Government's proof, which introduces defendant Gondolfo Sciandra to the saga, requires synopsis. On March 10, 1961, Sciandra, who had been working for a retail meat market owned by Castellana, his relative by marriage, organized a meat supply business known as G. S. Food Dealer ("G. & S."). Operating from one of Castellana's warehouses, occupied rent-free, Sciandra bought exclusively from Murray. During the brief three-week period of his ownership, G. & S. purchased from Murray approximately $240,000 in meats and provisions, giving rise to an unpaid debt that reached $176,353.83. Prior statements by Sciandra indicated that he traded mainly through Pagano, with whom he admittedly did not discuss credit terms. Instead, Sciandra "told him that I had some good accounts and that as soon as I would get paid for the merchandise I would in turn send him a check for the amount of money I owe him," although he did not "know what the accounts were exactly." Moreover, as in the case of Murray-Pride transactions, there were instances where Sciandra paid Murray less than the billed price or even less than Murray's own wholesale cost. And, even though they were aware of G. & S.'s mounting liability to Murray, Newman and Joseph Weinberg continued to accept Sciandra's orders and Stanley Weinberg did not call a halt to credit extensions.

Murray's mounting sales to Pride and G. & S. meant, of course, that there was a corresponding pyramiding in wholesale purchases by the company, which more than quintupled from $233,000 in November 1960 to approximately $1,229,000 for the first three weeks of March 1961. During January and February Murray paid for these purchases promptly within the usual seven-day credit period characteristic of the quick-turnover meat business, but this pattern changed significantly in early March when the size and number of the meat and poultry orders rose rapidly and payments were delayed. When combined with Murray's rapidly burgeoning sales, this failure to use the proceeds from Pride and G. & S. to pay supplier-creditors produced a larger-than-usual .bank balance, which Pagano proceeded to raid as the culmination of the conspiracy.

The record reveals, in great detail, how during the critical period from March 20 to March 29, 1961, Pride poured hundreds of thousands of dollars into Murray's bank accounts, in cut-price payment of outstanding bills, while *pari passu* Pagano withdrew $747,000 as the deposits were being made. The money-drawing operation began on the morning of March 20 when Pagano and Stanley Weinberg went to Murray's bank—the Royal State, located in the East Bronx, to cash a check for $50,000 payable to Pagano's order, drawn by a Murray clerk at Stanley's direction, and signed for Murray by both Pagano and Stanley. At the bank's branch office, Stanley told an officer that the withdrawal was "need-

ed to pay some trade bills" and the check was cashed. Later the same afternoon, an additional $50,000 was withdrawn from the Murray account at the Royal State Bank under similar circumstances. But, when Pagano and Stanley sought to withdraw still another $50,000 on Tuesday, March 21, they were refused by a bank officer who advised them that the Royal Bank would not continue paying out large sums of cash against uncollected funds.[4]

Undaunted by the Royal Bank's prudence, Pagano opened another account for Murray at the Commercial Bank of North America, located on Fifth Avenue in midtown Manhattan. Pride already maintained an account with the Commercial Bank and it was either Castellana or Sciandra who telephoned the Bank, on behalf of Pride, recommending acceptance of the new Murray account. Later that day, Wednesday, March 22, Sciandra—a frequent depositor of Pride checks—introduced Pagano to the Bank's officers, telling them that the Murray account was being opened to facilitate cashing checks drawn against Pride deposits in the same Bank. Within the space of one week, Pagano withdrew $645,000 from the Murray account in the Commercial Bank by cashing checks which, like those brought to the Royal Bank, were payable to him and signed by Stanley and himself. During this period Sciandra regularly delivered Pride checks drawn to Murray's account to the Bank, where he joined Pagano in watching a bank officer make out Murray deposit slips and then stood by as Pagano withdrew roughly comparable sums from the Murray account, thus completing the circle around which the money flowed. When a bank officer sought some explanation for Pagano's large withdrawals, Sciandra disingenuously replied that it was the "height of the [Easter] season and large purchases have to be made."

The most significant evidence introduced by the Government on this phase of the case established that the Pride checks deposited to Murray's account in the Commercial Bank during this ten-day period were almost equal in daily and total amounts to Pagano's withdrawals. Thus, the record discloses the following:

| Date | Castellana-Pride deposits to Murray's accounts | Cash withdrawals from Murray's accounts |
|---|---|---|
| March 20 | $ 93,156.46 | $100,000.00 |
| March 21 | 75,000.00 | (attempted $ 50,000.00) |
| March 22 | 40,000.00 | 35,000.00 |
| March 23 | 50,000.00 | 50,000.00 |
| March 24 | 125,000.00 | 127,000.00 |
| March 27 | 241,930.95 | 250,000.00 |
| March 28 | 90,000.00 | 125,000.00 |
| March 29 | 35,000.00 | 60,000.00 |
| Totals | $750,087.41 | $747,000.00 |

These transactions transposed Pride's debt to Murray of $441,000 as of March 20 into a credit balance of approximately $78,000 by March 29,[5] despite additional purchases during the ten-day period by Castellana's company. Three noteworthy factors rounded out the Government's proof concerning this brief but

4. The Royal Bank made one minor exception to this declared policy, cashing on March 24 a relatively small Murray check for $2,000 drawn to Pagano's order.

5. At the close of the month, the Pride-Murray account substantially balanced due to continued transactions between the two corporations.

important time span: (1) A Pride accountant testified that the checks drawn to Murray's account were unusual for the company in that they were often for amounts exceeding $25,000, frequently were in round figures, and many times were certified, permitting immediate withdrawal. (2) At the same time, Stanley Weinberg furnished Pagano with several checks of differing amounts on particular days so that he might withdraw whatever sum happened to be in the Commercial Bank account at the time Sciandra delivered the Pride checks. (3) Finally, about one-fifth or $150,-000 of the Pride deposits derived from a short-term loan which Castellana negotiated with a factor who, in early 1960, had a lending arrangement with Murray, but with whom Castellana himself had never dealt before and with whom he never did business again. Pride received the money (two-thirds in certified checks) on March 27, 1961, deposited it promptly in Murray's account at the Commercial Bank, and repaid the factor by April 14.

While Pagano was thus siphoning off the proceeds of Murray's sharply increased sales to Pride, Newman and the Weinbergs continued to step up purchases from their suppliers, all the time freely but falsely assuring them of payment in due course. Indeed, the appellants concede that Newman and Joseph Weinberg cajoled some suppliers to ship more goods when they were aware that Pagano's withdrawals were fast putting Murray in a precarious financial condition. For example, when the poultry suppliers who dealt with Newman came to see him about unpaid bills, he uniformly assuaged their fears with assurances that there was "nothing to worry about." Instead of mentioning Pagano's withdrawals or the depleted capital situation of the company, he sought to explain away the delayed payments by referring to a comparatively inconsequential $30,-000 error in Murray's Royal State Bank account. There was also evidence, in the form of bank records and testimony by Murray's supplier-creditors, to establish that Newman and the Weinbergs gave false excuses that checks were already in the mail, that Stanley permitted checks amounting to hundreds of thousands of dollars and payable to suppliers to accumulate unsigned on his desk, and that stop orders totaling more than $75,-000 were issued by the corporation's secretary-treasurer on many of the checks actually sent out during March. The situation was further aggravated when, at Pagano's request, Stanley issued credit memoranda to Castellana even though he knew that Pagano was personally drawing off the company's liquid assets. By the end of the fatal month of March 1961 Murray's suppliers, having been thoroughly deceived by the Weinbergs and Newman, were drained of approximately $1,300,000. This sum represented outstanding bills that would never be paid because Pagano had virtually emptied the meat packing company's bank accounts.

Not until after Pagano's final withdrawal of $60,000 on March 29 did the conspiracy enter its penultimate phase when Joseph Weinberg consulted a lawyer-friend, Abe Platt, seeking a remedy for the financial debacle caused by the rapid-fire withdrawals. Platt testified that he attended meetings with Newman, the Weinbergs, Pagano and Castellana at a Manhattan restaurant at which they discussed the possibility of initiating settlement negotiations with the defrauded creditors. They decided to retain a bankruptcy lawyer, Harris Levin, who proceeded to work out a tentative settlement arrangement with the suppliers whereby Murray would pay 40% of its total indebtedness and post $100,-000 as a good faith down payment. Between April 3, when the plan was approved, and April 5, $100,000 was brought to Platt's office by a friend of Pagano, one Dominick Cirillo, and deposited in a special account in a downtown Manhattan commercial bank under Levin's name. Three days later, however, at another restaurant meeting, Platt was advised that Murray could not go forward with the proposed settlement

because the final total indebtedness of $1,300,000 exceeded the anticipated liabilities by $200,000. Then, with Levin's authorization, Platt joined Cirillo and Sciandra when they withdrew the $100,000 from the special account at the bank, the latter two dividing the money and leaving the bank separately; the sum was, of course, never recovered.

After it was clear that the settlement talks had failed, Murray's creditors filed an involuntary petition in bankruptcy on April 11, 1961. But this did not mean a cessation of the defendants' fraudulent activities, for Pagano and Stanley Weinberg deposited $12,000—the substantial portion of the bare remains withdrawn six days earlier from Murray's account at the Royal State Bank (admittedly to escape attachment)—in a special escrow account to be managed by Platt in his name. Thereafter, the Weinbergs directed Platt to issue checks from the special account; $6,000 was given to Pagano, allegedly to pay the expenses of a fund-raising trip he made, with the Weinbergs, Cirillo and Platt, to Los Angeles, Las Vegas and Palm Springs. Platt testified, however, that in so far as he knew no efforts were made to raise funds, but instead the money was spent largely on golf courses, gambling, self-indulgence and entertainment. And, notwithstanding the filing of the bankruptcy petition, Stanley Weinberg and Pagano opened another bank account for Murray in a Mount Vernon, New York, bank, using Platt's address without his authorization. Ostensibly, the purpose of the account was to receive Murray collections. With full knowledge of what had transpired in late March, Stanley permitted Pagano to be made sole signatory of this new account.

Murray was adjudged a bankrupt on May 11, 1961, owing a total of approximately $1,300,000 to some 85 creditors. The corporation's assets totaled $1,060,442.15, of which $745,000 were promissory notes from Pagano, $268,692.15 were accounts receivable, and the remainder of its assets totaled less than $50,000. The eight-count indictment was returned in May 1963. By then, most of the principals had been examined in proceedings before a Referee in Bankruptcy and Murray's trustee in bankruptcy had brought a civil action against the individual defendants and others alleging a conspiracy to defraud Murray and its creditors.

## II.
### Admissibility of Prior Sworn Statements

The trial court, exhibiting meticulous care, permitted the introduction of admissions previously made by the individual defendants (except Pagano) in the civil case depositions and Section 21, sub. a bankruptcy examinations, carefully and repeatedly admonishing the jurors, except for one trivial exception, that the statements were to be weighed as evidence only as against the particular declarant. We see no basis for finding, as the defendants contend, that these statements were improperly received as admissions, or that they were privileged, or that there was a harmful spill-over effect against the co-conspirators.

Significantly, the admissions were not received until the Government produced independent proof of the existence of the conspiracy and also introduced independent extrinsic evidence regarding the subject matter of the defendants' pre-trial statements. Both before and after each statement was admitted and in his charge prior to submission of the case to the jurors, the trial judge scrupulously pointed out that the out-of-court statements—although given under oath with opportunity for cross-examination by each of the appellants—could be considered only against the particular defendant who made the admission. There was, in other words, strict adherence to the rule laid down in United States v. Bufalino, 285 F.2d 408 (2 Cir. 1960), that proof in a mass conspiracy trial must be individualized and compartmentalized, defendant by defendant and count by count. See also United States v. Dardi, 330 F.2d 316 (2 Cir.), cert.

denied, 379 U.S. 845, 85 S.Ct. 50, 13 L. Ed.2d 50 (1964); United States v. Agueci, 310 F.2d 817, 99 A.L.R.2d 478 (2 Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963); United States v. Stromberg, 268 F.2d 256 (2 Cir.), cert. denied 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959).

A. Although citing no explicit statutory or case authority to support their position, Joseph Weinberg and David Newman advance the technical claim that their admissions were privileged under Section 7, sub. a(10) of the Bankruptcy Act, 11 U.S.C. § 25 sub. a(10), which provides that "no testimony given by [the bankrupt] shall be offered in evidence against him in any criminal proceeding, except such testimony as may be given by him in the hearing upon objections to his discharge." We believe, however, that a reasonable construction of the statutory scheme does not permit either Newman or Joseph Weinberg to utilize this limitation because neither was "the bankrupt."

We learn from the leading treatise-writer that before 1938 there was a split of authority as to whether the officer of a bankrupt corporation was permitted to invoke the protection of Section 7. 1 Collier, Bankruptcy 1020 n. 27 (14th ed. 1962). This Court, for example, in Kaplan v. United States, 7 F.2d 594 (2 Cir.), cert. denied, 269 U.S. 582, 46 S. Ct. 107, 70 L.Ed. 423 (1925), ruled that the controlling figures in a bankrupt corporation and their co-conspirators did not come under the umbrella of the privilege. But, in 1938 Congress added Section 7, sub. b to the Act, providing that

> Where the bankrupt is a corporation, its officers, the members of its board of directors or trustees or of other similar controlling bodies, its stockholders or members, or such of them as may be designated by the court, shall perform the duties imposed upon the bankrupt by this title.

This statutory change, we are told, "apparently resolved the uncertainty, making it clear that the privilege does apply to [an officer of a bankrupt], *at least when the court designates him to perform the duties of the bankrupt.*" 1 Collier, Bankruptcy 1020 (14th ed. 1962) (emphasis added).

As we read the cases, a meaningful distinction, rooted in the statutory language, should be drawn between the corporate officer who testifies voluntarily, and thus cannot claim the privilege, and the one who, having been *directed* to appear by the bankruptcy court, has thereby been "designated by the court [to] perform the duties imposed upon the bankrupt by this title." Thus, in United States v. Weissman, 219 F.2d 837 (2 Cir. 1955), we held that the Section 7 privilege could be invoked by the sole owner of a number of corporations who was the "only person financially interested in any of them," with "absolute control of their conduct," even where "he was neither an officer, a director, nor indeed even a shareholder of record in any of them." Judge Learned Hand, writing for the Court, distinguished the earlier decision in In re Bush Terminal Co., 102 F.2d 471 (2 Cir., 1939), holding that a former stockholder director of the debtor, who had never been an officer and who gave up his directorship and shareholdings more than three years before a reorganization petition was filed, could not lawfully be examined under Section 7. Judge Hand noted that Bush Terminal did not concern anyone who had been "designated by the court" to perform the bankrupt's duties. In contrast he observed that Weissman was *directed* by a Referee to sign the bankrupt's schedules in bankruptcy and therefore came under the protection of Section 7, sub. b as one of the "stockholders or members" who was "designated by the court" to "perform the duties imposed upon the bankrupt."

Under the circumstances of this case, however, it is clear that Newman and Joseph Weinberg were not performing the bankrupt's statutorily-imposed duties when they were examined. It was not their "duty" to testify in

these proceedings, nor were they designated or directed to perform any of the bankrupt's other duties. In any event, the privilege against self-incrimination was available to them and could have been invoked during their testimony in the 21(a) examinations, Arndstein v. McCarthy, 254 U.S. 71, 41 S.Ct. 26, 65 L.Ed. 138 (1920), if they determined to do so, thus adequately protecting their rights. A broader interpretation of the Section 7 immunity under these circumstances would encourage falsification for exculpatory purposes with all advantages to those engaged in defrauding creditors and with every disadvantage to the latter group. Cf. United States v. Epstein, D.C., 152 F.Supp. 583, 586–588 & 587 n. 12.[6] It is interesting furthermore that Section 7, sub. b, in merely stating who may be designated to perform the duties imposed upon a corporate bankrupt, makes no explicit reference to extension of the Section 7, sub. a(10) privilege. Thus, we believe that Section 7, sub. b cannot be read in a vacuum and must be considered in the light of Section 7, sub. a as conferring immunity only if the director or shareholder is specifically designated to perform the bankrupt's duties.

■■ Turning to the use of Stanley Weinberg's prior admissions, we assume, *arguendo*, that by filing the required bankruptcy schedules as Murray's secretary-treasurer, he came within the statutory definition of "the bankrupt" and thus was entitled to invoke the Section 7 privilege. Nevertheless, there was no occasion to resort to that privilege because no part of Stanley's 21(a) examination was introduced and the section does not apply to the deposition testimony, given in separate related civil litigation and read into the record. We see no reason to broaden the privilege so that it encompasses private civil case discovery examinations. The purpose of the privilege—assuring complete disclosure in those proceedings where the Government and the public have a vital interest—is adequately served if Section 7, sub. a(10) is limited, as construed above, to officers or others designated to perform the bankrupt's statutorily-delineated duties.

■ B. Nor is there any basis to the claim that, notwithstanding the trial judge's repeated cautionary instructions, the admissions had a prejudicial spillover effect on the defendants other than the declarant. On the record before us, where more protection was afforded the defendants than in Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), the holding there is clearly dispositive of this issue. In Delli Paoli the appellant contended that reversible error was committed in receiving a co-defendant's confession without deleting references implicating himself and other confederates. The Supreme Court rejected this argument, noting that the trial court clearly stated—indeed, emphatically warned—that the confession was to be considered only in determining the guilt of the confessor and not that of the other defendants.

6. The Epstein case involved a conviction for using the mails to send false and fraudulent financial statements to persons from or through whom the defendant wished to secure credit, in violation of 18 U.S.C. § 1341. In post-trial motions the defendant, citing Section 7, sub. a(10), contended that error was committed in admitting portions of the testimony he gave before a Referee in Bankruptcy at special Section 21(a) meetings held after creditors filed an involuntary petition in bankruptcy. The court, citing McCarthy v. Arndstein, supra, rejected this argument, noting that since there was no duty to testify in the 21(a) examination, even though Epstein was directed to appear by the bankruptcy court, the testimony was not privileged. "[A]ny testimony of the bankrupt given at an examination under * * * Section [7 of the Bankruptcy Act, which details the duties of the bankrupt], being compulsory, may be privileged," the court wrote, "[b]ut testimony under § 21 is given by the bankrupt as it would be by any other witness in a proceeding in which it is not made his duty to testify, and, therefore, it is not privileged." 152 F.Supp. at 587–588. See also In Matter of Mutual Security Savings & Loan Ass'n, Inc., 214 F.Supp. 877 (D.Md.1963).

The rationale is applicable with greater force to the case before us for "[u]nless we proceed on the basis that the jury will follow the court's instructions where those instructions are clear and the circumstances are such that the jury can reasonably be expected to follow them, the jury system makes little sense." 352 U.S. at 242, 77 S.Ct. at 300.

We have already indicated that the foregoing principle is more readily applicable to this case. Here, the Government did not introduce any prior admissions as devastatingly incriminating as the signed confession of Delli Paoli's confederate. Rather the statements disavowed any intentional wrongdoing and were introduced simply to show an awareness of what was transpiring which, when conjoined with the declarants' actual conduct, supported the findings of guilty knowledge. And, several additional factors persuasively indicate that there was no prejudicial spill-over effect: (1) Each defendant played a separately defined role in the conspiracy and the individual interest of each was constantly emphasized by the court. (2) The prior statements were received only after the trial court determined that *other* independent evidence as to the same subject matter was already in the record; illustrations are the testimony of bank officers concerning the March withdrawals, as well as the actual withdrawal checks and bookkeeping figures showing the extraordinary escalation of purchases and sales rising to the apex in mid-March. (3) Finally, the record nowhere indicates that the jury misunderstood or was in any way confused by the limiting instructions. Indeed, it is interesting to note that the jurors, during their deliberations, never asked to see the transcripts of the 21(a) examinations or the depositions, but instead first called for those exhibits that might be exculpatory and then for the highly incriminating stop-payment orders issued by Stanley Weinberg.

In sum, having balanced the probative value of the pre-trial admissions, in a case where circumstantial evidence of knowledge and intent was substantial and critical, against the possible prejudicial effect on the co-defendants, we are persuaded that the trial court wisely exercised its broad discretion in ruling in favor of admissibility with prudent limiting instructions that adequately protected the rights of all parties. Model Code of Evidence rule 303 (1942). As in Delli Paoli, supra, the instructions were sufficiently clear and it was reasonably possible for the jury to follow them. No reversible error was committed.

C. The single exception to the trial court's firm policy of admitting the prior statements only as against the declarant forms the basis of Castellana's complaint that error was committed in permitting introduction of a statement by Stanley Weinberg, made during his civil case deposition testimony, to the effect that Castellana was present at one of the April restaurant meetings at which settlement was discussed. At the trial, Castellana denied attending any such meetings. The prosecution, in rebuttal, then offered Stanley's prior sworn statement in which he said that he recalled attending a restaurant meeting with Castellana, who was present because "we had developed a very friendly relationship toward the end of the business situation * * * and I knew he was very interested in what was happening to us." In this particular instance—and only this instance—the testimony was received against Stanley and Castellana as well. We find that, in light of all the circumstances present in this case, this minor incident in connection with an isolated situation did not rise to reversible error.

Initially, it is questionable whether any error was committed for we have held that a statement—made during and in furtherance of a continuing conspiracy—falls within the long-recognized co-conspirator exception to the hearsay rule, even in the absence of a conspiracy count and when offered as proof on a substantive count. United States v. Marchisio, 344 F.2d 653 (2 Cir. April 9, 1965).

And Judge Clark remarked in United States v. Switzer, 252 F.2d 139, 142–143 (2 Cir.), cert. denied, 357 U.S. 922, 78 S.Ct. 1363, 2 L.Ed.2d 1366 (1958), it is reasonable to assume, in connection with schemes to transfer assets to defeat the bankruptcy laws and defraud creditors, that post-transfer concealment is an integral part of the original unlawful agreement. Furthermore, the traditional objections to hearsay evidence are particularly inappropriate in this situation because the reliability of the deposition testimony was assured, insofar as possible, by the fact that it was under oath, transcribed and later signed, cf. United States v. DeSisto, 329 F.2d 929 (2 Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964), and Castellana had an opportunity to cross-examine Stanley at the time the deposition was taken. We are loath to reduce the corpus of hearsay rules to a strait-jacketing, hypertechnical body of semantical slogans to be mechanically invoked regardless of the reliability of the proffered evidence. Instead, "we should indeed welcome," as Judge Learned Hand once wrote, "any efforts that help disentagle us from the archaisms that still impede our pursuit of truth." United States v. Allied Stevedoring Corp., 241 F.2d 925, 934 (2 Cir.), cert. denied, 353 U.S. 984, 77 S.Ct. 1282, 1 L.Ed.2d 1143 (1957).

■ But, our decision does not rest on this ground for we are convinced that any error which might have been committed was, on the record before us, harmless. Given the overwhelming evidence of Castellana's guilt, we are convinced that the jury's guilty verdict was not "substantially swayed by the error," Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), or that there is even "a reasonable possibility that the evidence complained of might have contributed to the conviction." Fahy v. State of Connecticut, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L. Ed.2d 171 (1963).[7]

In United States v. Guerra, 334 F.2d 138 (2 Cir.), cert. denied, 379 U.S. 936, 85 S.Ct. 337, 13 L.Ed.2d 346 (1964), we found that no prejudice could possibly have resulted from the admission of defendant Rivera's post-indictment statements made in the absence of counsel under circumstances that required exclusion by virtue of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). The error charged there was but a fly-speck on one page of a 900-page trial record; here the purported error can fairly be described as only a "needle in the haystack" of a transcript that runs to more than 3,000 pages.

Indeed, when Stanley's statement was admitted to rebut Castellana's self-serving denials, the record already included testimony from Platt that Castellana had attended several early April settlement discussions with Pagano, Newman, and the Weinbergs, at a midtown Manhattan restaurant. Moreover, the insignificant item introduced from Stanley's deposition had minimal rebuttal effect because he did not say who else attended the meeting, but instead explained Castellana's presence in his favor, stating that he was invited because of his friendly interest in Murray's travails. In fact,

7. Our dissenting brother votes to reverse Castellana's conviction because we "have no way of knowing * * * what weight the jury may have given to this evidence." But if this lack of absolute certainty requires reversal of every conviction, no matter how *de minimis* the error may have been, we would be required to reverse most criminal convictions. Such a rule would repeal *sub silentio* the harmless error doctrine, as embodied in 28 U.S.C. § 2111 and Fed.R.Crim.P. 52(a). The very plain admonition of the rule, we have been told, is "[d]o not be technical, where technicality does not really hurt the party whose rights in the trial and its outcome the technicality affects." Kotteakos v. United States, 328 U.S. 750, 760, 66 S.Ct. 1239, 1246, 90 L.Ed. 1557 (1946). And, "the discrimination [the command] requires is one of judgment transcending confinement by formula or precise rule"; it suffices that our "conviction is sure that the error did not influence the jury, or had but very slight effect." 328 U.S. at 761, 764, 66 S.Ct. at 1246, 1248.

the trial judge in summarizing the evidence in his charge noted that Stanley did not state that Platt was present at the particular meeting to which the rebuttal testimony referred. Most important of all, the Government's case against Castellana was firmly established by highly probative, cumulative testimony, quite apart from the inconsequential question whether or not he attended a restaurant meeting with Stanley Weinberg in April 1961.

To paraphrase what we said in United States v. Guerra, supra, reversal of Castellana's conviction by mechanical or *per se* invocation of the much-maligned hearsay rule, see generally McCormick, Evidence, ch. 25 (1954), would transform a meaningful expression of concern that jurors be confronted with reliable evidence into a meaningless mechanism for the obstruction of justice. The harmless error principle, as embodied in 28 U.S.C. § 2111 and Fed.R. Crim.P. 52(a), prevents such results by assuring that courts of review do not "tower above the trials of criminal cases as impregnable citadels of technicality." Kavanagh, "Improvement of Administration of Criminal Justice by Exercise of Judicial Power," 11 A.B.A.J. 217, 222 (1925). In applying the rule to this case, we simply follow the Supreme Court's admonition

> to substitute judgment for automatic application of rules; to preserve review as a check upon arbitrary action and essential unfairness in trials, but at the same time to make the process perform that function without giving men fairly convicted the multiplicity of loopholes which any highly rigid and minutely detailed scheme of errors, especially in relation to procedure, will engender and reflect in a printed record. Kotteakos v. United States, 328 U.S. at 760, 66 S.Ct. at 1245.

### III.

### Additional Questions

The appellants' remaining contentions deserve only summary treatment. Evidence of the April 1961 activities was properly admitted because the transactions and occurrences—the settlement conferences and the disappearance of an additional $112,000—were in furtherance of the conspiracy to defraud Murray's creditors by fraudulently transferring the company's assets. Once this was established, Platt's testimony concerning the post-withdrawal activities did not invade the attorney-client privilege, as Newman and the Weinbergs contend, because the communications were made while perpetrating a fraud. 8 Wigmore, Evidence § 2298 (McNaughton Rev. 1961).

Furthermore, our examination of the court's charge reveals no merit to Castellana's contention that the jury was not properly instructed on the need to prove that each of the individual defendants knowingly and fraudulently caused the transfers of Murray funds to Pagano. The jurors were correctly advised that the Government was required to establish knowledge on the part of each defendant of the objectives of the conspiracy—to defeat the bankruptcy law or to defraud Murray's creditors. Similarly, the theory that Pagano acted alone in fraudulently transferring Murray's assets was brought home to the jurors by the constantly reiterated admonitions that the evidence against each defendant should be considered independently and separately. The Court also restated the respective contentions that Castellana, Newman and the Weinbergs had nothing to do with the payments to Pagano and did not aid him in withdrawing the money from Murray's accounts at the Royal and Commercial Banks between March 20 and March 29, 1961. Indeed, the trial judge spelled out the Newman-Weinberg defense that they could do nothing to stop Pagano's withdrawals and that his control of the company handcuffed them, despite their efforts to induce him to return what he had taken.

Nor was there error in the court's charge that the jury might find the defendants guilty of the substantive

counts if they were members of the conspiracy at the time of the withdrawals and the withdrawals were in furtherance of the conspiracy. Pinkerton v. United States, 328 U.S. 640, 643–648, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); Nye & Nissen v. United States, 336 U.S. 613, 618, 69 S.Ct. 766, 93 L.Ed. 919 (1949). Finally, failure to note any objection precludes assigning as error the claim here that the trial court's failure to instruct the jury that a co-conspirator's acts and declarations, made in furtherance of the conspiracy, may serve as evidence against his co-defendants only with respect to the conspiracy count. In any event, we recently held, in United States v. Accardi, 342 F.2d 697, 700 (2 Cir. 1965), that such statements may properly be considered against a co-defendant *on the substantive counts* once the jury finds, by independent proof, that a conspiracy existed in which the defendant was a member and that his statements were made during and in furtherance of the conspiracy.

In reviewing a similarly complex multi-defendant conspiracy case we commented that "[i]n a trial of this dimension, each juror is faced with a difficult task in compartmentalizing the evidence with regard to each particular defendant and keeping clearly in mind the full circumstances of each transaction." United States v. Agueci, 310 F.2d 817, 829, 99 A.L.R.2d 478 (2 Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). Here, as there, the trial judge "patiently and capably" discharged the "burden of impressing upon the jury the need for judging each defendant separately" so that "justice [might] be meted out to the individual rather than to the group." Ibid.

Appellants' other allegations have been considered and rejected, and are too insubstantial to warrant discussion. The judgments of conviction as to all of the defendants are hereby affirmed.

HAYS, Circuit Judge (in part concurring in the result and in part dissenting):

I concur in the result, except that:

(1) I would direct a new trial for Newman and Joseph Weinberg on the ground that they were entitled to the protection of Section 7, sub. a(10) of the Bankruptcy Act, 11 U.S.C. § 25, sub. a (10).

The majority, applying mechanically a technical concept of corporate identity, overlooks entirely the purpose of Section 7, sub. a(10) which is, of course, to encourage corporate officers, directors and shareholders to testify freely and fully as to the pre-bankruptcy corporate activities. Directors and shareholders who rely on the protection of the statute and testify frankly in the investigation of the corporation's affairs cannot fairly be faced with their own incriminating admissions in a subsequent criminal trial.

(2) I would direct a new trial as to Castellana on the ground that the admission as evidence against him of Stanley Weinberg's deposition constituted reversible error.

Our court has gone very far in authorizing the admission of hearsay evidence. United States v. DeSisto, 329 F.2d 929 (2d Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964). However, our position still falls considerably short of basing a criminal conviction on testimony taken by deposition in a civil proceeding.

As to the error in admitting his testimony being "harmless error," my brothers of the majority have no way of knowing, of course, what weight the jury may have given to this evidence. For all that appears, it may have been a dispositive factor in the jury's deliberations.