Peter **CASTELLANA** and **Pride Whole-
sale Meat & Poultry Corp.,** Appel-
lants,

v.

**UNITED STATES of America,** Appellee.

**No. 454, Docket 31150.**

United States Court of Appeals
Second Circuit.

Argued May 9, 1967.

Decided May 22, 1967.

Archibald Palmer, New York City, for
appellants.

Edward Meyer, Asst. U. S. Atty. (Rob-
ert M. Morgenthau, U. S. Atty., Southern
District of New York, Michael W. Mitch-
ell, Asst. U. S. Atty., of counsel), for ap-
pellee.

Before SMITH, KAUFMAN and
HAYS, Circuit Judges.

IRVING R. KAUFMAN, Circuit
Judge:

Based in the main on conclusory epi-
thets without benefit of factual basis,
Peter Castellana and Pride Wholesale
Meat & Poultry Co. (Pride) appeal from
an order by Judge Bonsal denying with-
out a hearing their motion, made pursu-
ant to 28 U.S.C. § 2255, to set aside their
judgments of conviction which this Court
previously affirmed in United States v.
Castellana, 349 F.2d 264 (2d Cir. 1965),
cert. denied, 383 U.S. 928, 86 S.Ct. 935,
15 L.Ed.2d 847 (1966).[1]

The appellants, along with 5 other de-
fendants, were convicted by a jury after
a six-week trial, of violating and con-
spiring to violate the federal bankruptcy

1. No memorandum or opinion was filed in connection with the denial of the § 2255 motion.

fraud act, 18 U.S.C. §§ 152 and 371.[2] The evidence upon which the convictions were based is set forth in detail in our prior decision; accordingly, a brief summary of the history of this case will suffice. The indictment charged the 7 defendants with knowingly and fraudulently agreeing to transfer monies and property of the Murray Packing Co., Inc. (Murray), totaling approximately $1,300,000, in contemplation of Murray's bankruptcy proceedings or with intent of defeating the bankruptcy laws. The evidence at the trial established that the conspiracy commenced in the latter part of 1960 when Joseph Pagano approached David Newman and Joseph and Stanley Weinberg (owners and managers of Murray, a wholesaler of meat and poultry), and persuaded them to sell him a one-third stock interest in Murray in return for a comparatively nominal investment of $35,000; simultaneously, Pagano gave them assurances that he would substantially increase Murray's sales and profits. This company was experiencing serious financial difficulties at that time. But, through Pagano's efforts, meetings were arranged between Newman, the Weinbergs and Castellana, at which Castellana agreed that his company, Pride, of which he was president and which operated a chain of wholesale and retail stores in the New York City area, would embark upon a program of purchasing large quantities of meat from Murray. As a result, by March 1961, Pride was purchasing meat totaling over $900,000 per month from Murray, in contrast to its purchases of $1000 in the month of November 1960. And it is not without significance that the evidence established that these purchases accounted for roughly 65% of Murray's total sales. More-over, the fraudulent plan had form and substance when it was established that Pride often paid less than the price for which it was billed, and frequently less than the actual cost to Murray.

As a consequence of the large sales to Pride, Murray multiplied its wholesale purchases five-fold between November 1960 and March 1961. Apprehensive suppliers seeking remuneration were constantly assured that payment for their merchandise was forthcoming, while almost at the same time Pagano was busy siphoning off Murray's cash. Within a period of less than 10 days he withdrew $747,000 from Murray's bank accounts. The Government's evidence was overwhelming and it revealed that the checks deposited by Pride in the Murray account during this time (representing payment for merchandise sold by Murray to Pride) substantially matched Pagano's withdrawals from the Murray account. See table at 349 F.2d at 270. As a result of this scheme, Murray's assets were soon depleted, and it ultimately passed into insolvency and bankruptcy, but not before the several defendants, after tentatively offering their creditors a settlement of forty cents on the dollar, fraudulently transferred another $112,000 to themselves.

Having set forth this brief but sufficient background of the controversy we are to decide, we proceed to examine the broadside attack made by Castellana and Pride in an effort to vacate their judgments of conviction.[3] At the outset, it is claimed that the evidence produced by the Government at the trial was insufficient to sustain the jury's verdict because it did not prove the requisite criminal intent. But, we need not pause long

---

2. Castellana was sentenced to 5 years on each of the 8 counts in which he was named, the sentences to run concurrently. He was also fined $10,000 on the conspiracy count, $5,000 on each of the 7 substantive counts, and was ordered to stand committed until the total fine was paid or he was otherwise discharged by law. Pride, the only corporate defendant, was charged only with conspiracy, and was fined $10,000.

3. The voluminous brief submitted on this appeal (113 pages) is often obscure and over-generalized. We have, nevertheless, reviewed the record of the first trial which was before this Court on the initial appeal and given meticulous care to the points raised and the assertions which the appellants appeared to make on this appeal.

over this for the same contention was argued to this Court on the direct appeal from the conviction, and an exhaustive study of the evidence led us to conclude that:

> [T]he evidence was more than sufficient to enable a reasonable jury to find appellants guilty as charged * * *. [W]e cannot avoid the conclusion that reasonable jurors could have been convinced beyond a reasonable doubt that each of the individual defendants was guilty of 'knowingly and fraudulently' transferring or concealing Murray's property 'in contemplation of a bankruptcy proceeding * * * or with intent to defeat the bankruptcy law.' 349 F.2d at 266–267.

■ It is well settled law that § 2255 cannot be utilized in lieu of an appeal, see United States v. Rosenberg, 200 F.2d 666, 668 (2d Cir. 1952), cert. denied, 345 U.S. 965, 73 S.Ct. 949, 97 L.Ed. 1384 (1953); United States v. Walker, 197 F.2d 287 (2d Cir.), cert. denied, 344 U.S. 877, 73 S.Ct. 172, 97 L.Ed. 679 (1952); nor may it be employed to relitigate questions which were raised and considered on the appeal, see United States v. Thompson, 261 F.2d 809, 810 (2d Cir. 1958), cert. denied, 359 U.S. 967, 79 S.Ct. 878, 3 L.Ed.2d 835 (1959); United States v. Marchese, 341 F.2d 782, 789 (9th Cir.), cert. denied, 382 U.S. 817, 86 S.Ct. 41, 15 L.Ed.2d 64 (1965). The instant § 2255 application, therefore, may not be utilized to reargue the sufficiency of the evidence.

Appellants next challenge the admission at the trial of certain depositions given by Castellana and other defendants in various civil and bankruptcy proceedings. Specifically, they object to the use against Castellana of a portion of Stanley Weinberg's civil deposition.[4] But, these contentions were also raised on the direct appeal and were rejected by a majority of the Court.[5] We found that with one "limited exception" the jurors were repeatedly warned that the statements could be used only against the particular declarant; and we held that the admissions were properly received because the Government had first produced independent proof that a conspiracy existed, and also independent extrinsic evidence regarding the subject matter of the statements contained in the depositions. We also explained at some length why we believed the admissions were not privileged under § 7a(10) of the Bankruptcy Act, 11 U.S.C. § 25a(10). With regard to the civil case deposition of Stanley Weinberg used against Castellana, we noted that it was probably admissible within the co-conspirator exception to the hearsay rule, see United States v. Marchisio, 344 F.2d 653, 668 (2d Cir. 1965), United States v. Annunziato, 293 F.2d 373, 378 (2d Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961), and we further pointed out that the traditional objections to hearsay evidence seemed particularly inappropriate since the reliability of Weinberg's statement was insured by the fact that it was taken under oath, transcribed and signed, and that Castellana had been given the opportunity to cross-examine Weinberg at the time this deposition was given. Moreover, we concluded that even if any error had been committed, it could "fairly be described as only a 'needle in the haystack' of a transcript that runs more than 3,000 pages." 349 F.2d at 276.

■ Since the propriety of the deposition's admissibility was considered in some depth by this Court on appeal, this claim too may not be relitigated by an application under § 2255. See United States v. Thompson, supra; United States v. Marchese, supra. Appellants boldly assert, furthermore, that the criminal prosecution against them was delib-

---

4. Castellana was the only defendant to testify at the trial.

5. Judge Hays in his dissenting opinion stated that he would have directed a new trial for Castellana on the ground that the admission as evidence against him of Stanley Weinberg's deposition constituted reversible error. 349 F.2d at 278.

erately delayed until the depositions in the civil and bankruptcy proceedings were available for use against them. This assertion is conclusory and the charge is bereft of facts and does not merit a hearing. See United States v. Rosenberg, supra.

 Intended as their grand coup, the appellants hurl the completely unsupported charge that the Government suppressed certain civil deposition testimony. They claim that this evidence would have indicated, contrary to the testimony of its witness Abe Platt, that Castellana did not attend certain conspiratorial meetings at the Roundtable Restaurant in Manhattan in April 1961. And, they go on to assert that Platt's testimony was perjurious and was coerced by the Government. With regard to the claim of this suppression, our examination reveals that the depositions in question were received in evidence at the trial and copies of them given to and seen by the defense attorneys. Indeed, portions of the allegedly suppressed depositions were read to the jury by defense counsel. The pencil-marked brackets on the depositions, to which appellants attempt to attach some sinister significance, were made by the Government at the request of the trial court in order to aid the defense by indicating exactly which portions would be read to the jury. Moreover, we are not told how the allegedly suppressed evidence contradicted Platt's testimony regarding Castellana's presence at the Roundtable meetings.

Finally, we find wholly without merit appellant's claim that Platt was coerced by the Government into giving false testimony to implicate Castellana. In our examination of the record on the initial appeal, we observed that similar suggestions were made at the trial during Platt's cross-examination. But the jury observed Platt on the witness stand and adjudicated his credibility. Moreover, there is nothing but appellants' bald conclusory charge, unaccompanied by any facts, to indicate that the Government knowingly and intentionally used perjured testimony. Accordingly, they were properly de-

nied a hearing. See United States v. Schultz, 286 F.2d 753, 755 (7th Cir. 1961); United States v. Spadafora, 200 F.2d 140, 143 (7th Cir. 1952).

Affirmed.