Carmine **PANICO** and Carlie **DiPietro,**
Movants-Appellants,

v.

**UNITED STATES of America,**
Appellee.

Nos. 468–469, Dockets 32953, 32954.

United States Court of Appeals
Second Circuit.

Argued March 26, 1969.

Decided June 25, 1969.

Jerome Lewis, New York City (Abraham Glasser, New York City, on the brief), for movants-appellants.

Arthur A. Munisteri, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York City and Roger J. Hawke, Asst. U. S. Atty., New York City, on the brief), for respondent-appellee.

Before WATERMAN, MOORE and FRIENDLY, Circuit Judges.

MOORE, Circuit Judge:

Carmine Panico (Carmine) and Carlie DiPietro appeal from an order of the District Court for the Southern District of New York, Lloyd F. MacMahon, Judge, entered on September 19, 1968, which denied their joint motions for relief under 28 U.S.C. § 2255. The order also denied a joint motion for disqualification of the sentencing judge because he was, they assert, a material witness. The basis of appellants' contentions here is that they were denied a fair trial because of jury prejudice created by the outrageous behavior of a co-defendant, Salvatore Panico (Salvatore)—the brother of Carmine—who was allegedly in the grip of uncontrollable psychological forces at the time. Specifically, ignoring their own repeated misconduct at the trial, appellants claim that Salvatore's "atrocious verbal and physical outbursts of violence" during the trial "must have antagonized the jury" not only against Salvatore but also against all the co-defendants, thereby making it impossible for the jury to give a fair and unprejudiced consideration to appellants' guilt or innocence. The appellants assert that there has not been an adequate adjudication of Salvatore's medical condition and that a hearing should have been held on this application on the cause of his misbehavior.

The appellants, along with eleven other co-defendants, were convicted on July 10, 1962, after a lengthy and difficult trial, of a substantial narcotics conspiracy. The trial lasted some ten weeks and was repeatedly interrupted by outbursts from the appellants, Salvatore and other co-defendants, who shouted obscenities at the trial court, the jury and the prosecutor, and, in the hope of provoking or creating a reversible error, generally attempted to disrupt the trial in every way possible. The incidents which occurred at trial are set forth in detail in our prior opinion on direct review of appellants' convictions, United States v. Bentvena, 319 F.2d 916 (2d Cir. 1963), and accordingly a short summary will suffice so that this present appeal is not viewed in isolation.

A first trial before Judge Levet, which lasted six months and wound its way "over every conceivable type of obstruction and interruption," resulted in a mistrial on the eve of the summations when the foreman of the jury broke his back in an unexplained fall down a flight of stairs in a deserted building late at night and there were no alternate jurors remaining to replace him. Because of continual and frequent delays and apparent illnesses, Judge Levet found it necessary to remand all the defendants who were out on bail. This order was affirmed on appeal. United States v. Bentvena, 288 F.2d 442 (2d Cir. 1961). The two defendants were held in contempt at the conclusion of the trial and these decisions were affirmed on appeal. United States v. Galante, 298 F.2d 72, 100 A.L.R.2d 431 (2d Cir. 1962).

Between the first and second trials, the defendants were again freed on bail. After continuous delays, during which some defendants claimed that they could not engage counsel although they had no problem raising substantial bail, trial was set for April 2, 1962. During the empaneling of the jury, Salvatore made his first outburst, which was echoed by co-defendant Loicano. The Court later found it necessary to remand all the defendants, which order was affirmed by this Court. United States v. DiPietro, 302 F.2d 612 (2d Cir. 1962). A renewal of the misadventures of the previous trial seemed imminent, as this Court remarked at the time.

The prediction proved accurate. The trial court was besieged with numerous motions for mistrial, severance, delay,

continuance and adjournment, which were denied, renewed and denied again. Certain defense counsel were repeatedly and inexcusably tardy. Throughout the trial there were constant claims by the defendants and some counsel of numerous incapacitating illnesses and injuries, all of which failed to be confirmed by physical examination. Five of the fourteen defendants, including Salvatore, claimed insanity. Verbal outbursts were commonplace. Under cross examination, a co-defendant Mirra threw his chair at the Assistant United States Attorney, but his aim was poor. Appellant Carmine shouted obscenities at the trial court and the prosecutor.

There were many more acts of misconduct requiring the Court to station a large number of marshals in the courtroom, to search spectators and to have both Panicos and Mirra gagged and shackled during the latter part of the trial. See discussion *infra*. It is sufficient to say at this point that there was a concerted effort to interfere with the judicial process. We have previously indicated that "more abhorrent conduct in a federal court and before a federal judge would be difficult to conceive." 319 F.2d at 930. At the conclusion of the second trial, eleven defendants were summarily held in contempt for their misconduct, including Salvatore.

THE SECTION 2255 APPLICATION

The appellants' application for relief under Section 2255 was denied by the trial court on the grounds that the claim of prejudice had already been litigated at trial, denied and the denial affirmed on appeal and that the cause of Salvatore's outrageous conduct was irrelevant, or at most only incidental, to the problem of whether the trial court had taken adequate measures to assure that appellants received a fair trial. The Court also rejected appellants' claim that post-trial medical information concerning Salvatore, which first came to light after the sentencing of the defendants and which is now supplemented by an affidavit of a psychiatric consultant, was new or that it shows that the trial judge erred in finding that Salvatore's acts were deliberate and calculated to disrupt the trial.

The court below first noted that most of the outbursts portrayed in the appellants' supporting affidavits occurred in the absence of the jury and then detailed Salvatore's conduct which took place before the jury. We will summarize them briefly. Salvatore first made an outburst because he was assigned counsel at the commencement of the trial to serve until his retained counsel returned later in the week from another trial. He shouted to the jurors then being empaneled:

> Do these people know I don't have a lawyer? What is this, Russia? There's nobody representing me here.

He was, in fact, then being represented by his temporarily assigned counsel who had represented him very capably during the first trial. Salvatore refused to talk to him, however. No significant disturbances followed for nearly seven weeks, but on May 23, 1962 after a brief recess, at the moment the trial judge entered the courtroom, Salvatore jumped into the jury box and, walking along the inside railing and waiving his arms in the air, shouted at the jurors:

> Get out of here. The Judge has got me guilty. Big John, Joe B, they are the junk pushers. We're innocent. My brother and I, we haven't got anything to do with this thing. They have me in jail already. Do you understand me? They have us in jail. Twenty years they want to give me.

The Court ordered Salvatore removed from the courtroom. Appellant Carmine then joined in the disruption, shouting "I want to see my brother." The trial was recessed. The next day, another disruption occurred during the testimony of defendant Mirra, but the trial was able to proceed. On the following day, during the first few minutes of testimony, Salvatore blurted out "DiPietro is talking about me there. He is the convicted dope pusher. Separate me from him." DiPietro responded "Stop him. I told you * * * Every one of my

witnesses, he made a holler." The jury was thereafter excused. In the absence of the jury, DiPietro stated to the Court "I never made a sound all this time. If he comes into this courtroom when I am here, I will strangle him. He interrupted my seven witnesses. Chain him down, if you got to." The trial was subsequently recessed and the Court ordered an examination of Salvatore by three psychiatrists.

Following their examination, a hearing was held on Salvatore's competence to stand trial, that is, whether he was able to understand the nature of the charge against him and whether he could assist his lawyer in his own defense. At the conclusion of the hearing, after listening to the expert testimony, the trial court found Salvatore competent to stand trial and warned him about further outbreaks.

The trial was resumed and Salvatore again disrupted the proceedings. The Court ordered that he be gagged and shackled to restrain him from further outbursts. No further incidents occurred during the remainder of the trial.

Subsequently, Salvatore made two suicide attempts under circumstances which made success impossible. The first was a hanging attempt in his cell when his brother was present. In the other, he made shallow cuts on his arm with a razor blade, which resulted in little loss of blood and required only first aid treatment. In both incidents he was not seriously injured. Thereafter, this Court ordered another psychiatric examination of Salvatore's competence to stand trial. Again, on the basis of psychiatric reports and examinations, the trial court found him competent.

After each and every outburst occurring before the jury, the trial court patiently and repeatedly instructed the jury that they must disregard the disturbances and remarks of any defendant. The judge stated that "the law requires * * * calm, cool and deliberate consideration of the evidence," and that the disturbances in court were not to be considered. He affirmed and re-

affirmed to the jury to put the incidents of misconduct out of their minds and to be calm, dispassionate and impartial in not allowing such incidents to prejudice them.

The court below stated that the material question was whether Salvatore's conduct during trial, sane or insane, deprived appellants of a fair trial, and not, as contended by the appellants, simply whether or not Salvatore was insane. "The focus of the inquiry," in the Court's view, "is * * * not on the cause of [the] misconduct, but on its effect upon appellants' rights."

While it may be true that the condition of Salvatore's mind was related to the fairness of appellants' trial, we agree with the court below that it is only incidentally related and that the fundamental question is whether the trial court dealt adequately with possible prejudice under the facts of this case. In short, the question is whether appellants' constitutional rights were violated, not whether someone else's rights were infringed. This exact question was raised on direct appeal and we held then that the trial court did everything in its power to minimize the effects of the disruptive conduct and outbursts of the appellants, Salvatore and other defendants. Here the perpetrators of much of the interruptions are claiming that they were prejudiced by disruptions of their co-defendant, in which they repeatedly and knowingly joined. Moreover, we also held then that the steps taken by the trial court were sufficient, reasonable and necessary to protect the rights of all the defendants. Inasmuch as these same contentions were litigated during trial and on direct review from the narcotics conviction, they cannot be relitigated in a proceeding under § 2255. Castellana v. United States, 378 F.2d 231, 233 (2d Cir. 1967).

Appellants contend, however, that their application presents "new facts" not previously considered and that because of the new evidence, a hearing should have been held. The allegedly new facts are, first, that after his con-

viction Salvatore was diagnosed a schizophrenic by a psychiatrist at Sing Sing Prison on July 12, 1962 and was committed to Dannemora State Hospital by order of a Westchester County Judge on August 22, 1962. However, the diagnosis of schizophrenia was merely tentative and later determined to be incorrect. It was subsequently downgraded to psychopathic personality, depressed episode, and on September 17, 1963 Salvatore had recovered sufficiently to return to prison. While this evidence was not before the court at trial, it is only cumulative of the expert testimony and psychiatric reports which the trial judge had on two occasions during trial. It also cannot be really considered new because this information was submitted to this Court on direct appeal of the conviction, it was argued by both sides as fact and was considered by us in reaching our decision. See Judge Friendly's dissent on Salvatore's appeal from his contempt conviction nine months earlier. United States v. Panico, 308 F.2d 125, at 129. There is, therefore, no basis for claiming that this post-conviction psychiatric data is either new or that it would have warranted relitigation of the claim that Salvatore's presence and conduct at the trial prejudiced appellants' rights to a fair trial.

The second item of evidence, which appellants claim is "new," is an affidavit by a Dr. Jay Katz, a psychiatrist retained by appellants for the purpose of this application. Based primarily on a reading of various parts of the trial transcript, exhibits and reports from psychological tests conducted in late December 1966, and on three and one-half hours of psychiatric interviews with Salvatore, held in late December 1966 and early January 1967, Dr. Katz claims that Salvatore was "helpless to control his conduct" during the 1962 trial. Appellant alleges that "Dr. Katz' findings are significant because of their authoritative *retrospective* impact on the entire medical picture of this record." Appellants' Brief at page 67.

Aside from the serious problems in making an accurate retrospective diagnosis based on a reading of a cold record over four years after the relevant event, Dr. Katz's conclusions can in no meaningful way be characterized as new evidence. At best his report is cumulative expert testimony. Its probative value is also questionable in view of the fact that he relied on only three and one-half hours of interviews with Salvatore and on a reading of the record and reports compiled during trial. A psychiatrist who examined Salvatore three times during the 1962 trial, Dr. Hyslop, noted in his report that citing instances of Salvatore's behavior from the trial record was "of little value in determining whether or not conduct was a product of mental disorder."

We conclude then that neither the tentative diagnosis of the psychiatrist at Sing Sing Prison, nor Dr. Katz' subsequent "retrospective" report warrants a full hearing on the issue of Salvatore's insanity during the 1962 trial. Neither can it be said that either is new evidence. It is also concluded that the identical issue raised her was previously litigated and determined adversely to the appellants.

MOTION FOR DISQUALIFICATION OF THE TRIAL COURT

Appellants seek to disqualify the trial court from hearing their Section 2255 application on the ground that he was a "material witness." 28 U.S.C. § 455. Judge MacMahon denied the motion on the ground that he was not a witness.

Section 455 of Title 28 provides:

Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein.

One of the purposes for which Congress passed Section 2255 was to

make use of the personal observations of the trial judge of trial occurrences in ruling upon attacks on convictions because of such occurrences. Mirra v. United States, 379 F.2d 782, 788 (2d Cir. 1967). As appellants recognize, to disqualify a judge in a Section 2255 application because of the fact that he made such observations would defeat this purpose entirely. However, appellants attempt to avoid this position by stating that, in view of the fact that Judge MacMahon announced his own observations at trial that Salvatore was faking and was not suffering from any psychological disorder and that Judge MacMahon is "going to be a witness in a Section 2255 proceeding," he "should not sit in that proceeding for any purpose." Appellants' Brief at page 70.

In view of our conclusion that no evidentiary hearing is warranted, it is determined that the refusal of the trial court to disqualify itself in hearing the Section 2255 application was not erroneous. As lower courts have recognized Section 455 does not in any way affect the trial court's sitting with respect to preliminary orders. See In Re Fox West Coast Theatres, 25 F.Supp. 250, 258 (S.D.Cal.1936), aff'd 88 F.2d 212, cert. denied sub nom. Talley v. Fox Film Corp., 301 U.S. 710, 57 S.Ct. 944, 81 L.Ed. 1363, reh. denied 302 U.S. 772, 58 S.Ct. 7, 82 L.Ed. 598 (1937), and Borough of Hasbrouck Heights, N. J. v. Agrios, 10 F.Supp. 371, 374 (D.N.J 1935), where the statutory language was slightly different. Halliday v. United States, 380 F.2d 270 (1st Cir. 1967), which appellants cite, holds nothing to the contrary. There the First Circuit held that where a required *hearing* under Section 2255 was to redetermine a factual issue presumably previously decided, the original judge should not preside. The decision specifically disclaimed any prohibition on the original judge from passing upon the legal sufficiency of an application under Section 2255, which is the present case. *Id.* at p. 274. The refusal of the lower court

to disqualify itself was, therefore, not an abuse of discretion.

We have considered the other arguments made by appellant and find that they are without merit. The order of the District Court is affirmed.